## STATE OF MAINE *vs.* ELBRIDGE W. REED.

*Exceptions. Evidence. Indictment. Jury—instructions to. Practice. Reasonable doubt. Witness.*

Whether a general exception to all the rulings and charge of the judge in any trial can be considered as a summary bill of exceptions to any opinions, directions, or judgments by which a party may be aggrieved, as required by the statutes, *quære ?*

Comments upon the testimony in the charge by the presiding judge, do not furnish any ground for exceptions. Nor will they be considered as depriving the respondent of an impartial trial, when, as in this case, the jury are so instructed that they must necessarily understand that they are the judges of the facts proved, and responsible for the inferences drawn from them.

In this case, a fair construction of the charge does not authorize the inference that the jury were instructed imperatively and as matter of law as to the force, effect and weight of the evidence, what the proof was, or that certain facts were in evidence; but the judge directing attention to certain suggestions developed by the testimony, left those matters to their consideration.

When omissions, whether of law or fact, are made in the charge, the proper remedy is, to call the attention of the judge to such omissions at the time, and not by exceptions.

A presiding judge may give requested instructions in his own language, or embody several requests in one instruction when the law is susceptible of being so stated, and the party has no valid ground of exceptions, unless an instruction which is law, is refused.

An explanation of a reasonable doubt that, "It is a doubt which a reasonable man of sound judgment, without bias, prejudice or interest, after calmly, conscientiously and deliberately weighing all the testimony, would entertain as to the guilt of the prisoner," is not erroneous; if inadequate, because it does not contain the element of moral certainty necessary to convict, (which is not admitted) the counsel should have asked at the time, such additional instruction as he desired.

Silence under a charge or suspicion of crime made to or expressed in the presence of a person, is legal testimony for the consideration of the jury as evidence of guilt.

Falsehood, evasion or silence under and in relation to crime, of which one knows himself to be suspected, is evidence tending to show guilt.

When a witness is impeached by proof of a prior statement made by him in conflict with his testimony upon the stand, it is competent for such witness upon re-examination, to give the circumstances and influences, under which the first statement was made.

ON EXCEPTIONS.

INDICTMENT for the murder of John Ray, who left his house in Medway Plantation about six o'clock in the afternoon of the twentieth day of September, 1870, to search for a missing cow that was pastured near Reed's premises, and never returned alive.

On Wednesday, the twenty-eighth day of September, 1870, his body was found buried in a hole in a secluded spot, upon a little island in the Penobscot River, the corpse covered with rotten wood and brush, and bearing marks of cruel and brutal violence; so severe a wound upon the left temple that the eye protruded two-thirds of the ball from its socket; the neck dislocated; evidence of blows upon the head, (raising a bunch the size of a hen's egg,) behind the ear, on the back between the shoulders, and on various other parts of his person; indicating terrible and fearful violence inflicted upon him by somebody.

Reed was a cousin to Mrs. Ray, and the acquaintance and intimacy between them had been such as to occasion gossip. When spoken to about it, at one time, and told that Ray "would give him fits," if he did not keep away from there; he replied, "Ray! G—d d—n him! If he ever says a word directly to me, I will wring his G—d d—d neck!" He made a similar threat to another witness, and told a third that if "Ray gave him any of his lip, he would kick hell out of him." For the two years preceding Ray's death, he and Reed were not upon speaking terms; and during most of the summer of 1870, Ray and his wife lived apart; separating early in March, and becoming reconciled and living together again in August. When Reed heard that Mrs. Ray was going back to live with her husband, he told her brother that "he would rather die than have her go back," adding that "he loved Mrs Ray, and could not help it;" that he "intended she should be nearer to him," and requested the brother to board her, which he declined to do.

Upon the morning of the twenty-first day of September, 1870, at about six o'clock, Reed went to a neighbor's, where it was noticed that his right hand was much injured, swollen and dis-

State *v.* Reed.

colored, and that his boots were wet, water spurting out of them, though the road between his house and his neighbor's was very dry.

He explained the injury to his hand, by saying he stumbled over some bars, while carrying a bunch of shingles the night before; but those of whom he obtained the shingles swore that he passed the bars without accident; and that all but the lower bar were pushed back.

This was the third trial of the case, the verdict rendered at the first having been set aside on account of the admission of improper testimony as to what a witness for the defence had previously said Reed had stated with reference to this injury to his hand; as appears by the report in 60 Maine, 550. At the second trial the jury were unable to agree; and this time the result was a verdict of murder in the second degree. The theory of the government was, that Reed wet his boots in conveying Ray's body across the east branch of the river to the island, where it was found.

Suspicion pointing to Reed as the guilty person, several of those who found the body, went directly from the burial-place in which it was discovered, to Reed's house, and one of them told him they had found Ray, and his reply was: "It is a sad affair;" nothing having been told him of the circumstances, nor whether Ray had been found dead or alive.

At the former trials Mrs. Ray had denied all knowledge of how her husband had come to his death, but she was now called as a witness by the prosecution, and stated that the prisoner came to her door in the evening of the twentieth of September, 1870, and said to her, "I have committed a horrible deed to-night;" and, on her asking what he had done, said he had got into a fight with her husband, and had killed him; and that if she told, the body would be put where it would cause the murder to be laid to her; that he was driving their cow out of his field, when he met Ray coming after her, upon the flat down under the hill; that they had some words, and then got into a smart fight, and he (Reed) struck him (Ray) with a club, and killed him.

The defence introduced her testimony given at the first trial,

when she swore to her husband's passing Tuesday night (the twentieth) in the house, and her knowing nothing of him after he went out early Wednesday morning, the twenty-first day of September, 1870. The government recalled her, and against the objection of the defendant, she was allowed to explain her conduct by saying that she was afraid to testify to the truth at the first trial, and was advised not to do so by a gentleman then acting as counsel for Reed; the State's attorney also proposed to show the advice given and a threat that, if she stated the truth, Reed would turn State's evidence against her; and that she was persuaded to go blueberrying at the time of the second trial, so as to avoid being summoned by the State; but the court would not admit this testimony. Another witness, a boy, who testified to seeing Reed down on the shore, under the bank opposite Ray's house, on the Tuesday night that Ray disappeared, was contradicted by the minutes of his statement at the first trial, that it was another night; he was allowed to explain by saying that the prisoner's sister told him that he did not see Elbridge down there that night, and if he said he did, she would get right up and stave his story all to pieces.

The prisoner was called as a witness by his counsel. In the course of his cross-examination he said that he "did not suppose he (Ray) had been killed; thought he had gone away as he usually did; gone off hunting or fishing." Later in the cross-examination, he said he did not know Ray's body was found when he met the finders; adding, in response to further query, that he "thought they had come to arrest him;" and when asked for what, replied, "For the murder of John Ray." The testimony was very voluminous, and there were many other facts and circumstances relied upon as tending to prove the guilt of the prisoner, but it is believed that the foregoing is a summary of those especially adverted to in the charge to the jury, the exceptions and the opinion.

The entire bill of exceptions was in these three lines: "And now in court, before the adjournment thereof, the respondent comes and excepts to all the rulings of the court, and to the charge of the court to the jury, and prays that his exceptions may be

allowed." Several of the witnesses testified to the existence of a foot print near the hole in which Ray was found, its measurement by Benjamin York, and its near correspondence with the length of Reed's boots; but York himself was not a witness upon this trial. The prisoner's counsel called the magistrate before whom Reed's preliminary examination was had, and asked if York, who testified there, said anything about tracks; but this question he was not permitted to answer. The judge, in his charge to the jury, after reminding them of the responsibility that rested upon them, spoke of the disappearance of Reed, the discovery of his mangled body, the threats of the prisoner, indicating his relations and feelings toward the deceased, the fact that there was nobody but Reed and Mrs. Ray to whom the slightest suspicion attached, and then remarked: "The question is whether the crime threatened was done by the person threatening, or by the wife who had just been reconciled, and had been living with him, or by some unknown being, toward whom no finger of suspicion has been pointed, of whose agency no acts have been shown, and from whose lips no threats are known to have been uttered."

He then stated the nature of the offence charged, reading the statutory definitions of it; defined malice and reasonable doubt; the difference between direct and circumstantial evidence, and the weight to be given each; spoke of the burden of proof and of the presumption of innocence; of the order of the proceedings from their initiation; of the credit to be given witnesses; the motives affecting the testimony of those for the State and for the defence; incidentally to this, remarking that "perjury to convict an innocent man of an offence never committed, and perjury to procure the acquittal of guilt, imply very different degrees of moral atrocity;" of the natural discrepancies as to hours and phraseology; and those relating to graver matters, that are inexplicable; then, reverting to the threats and Reed's alleged avowal of his love for his cousin, as connected with the subject of motive, he said that if this testimony was false, "it is not merely to be disregarded, but it throws doubt and suspicion upon the case for

State *v.* Reed.

the government. If true, then how stand the parties? Elbridge
Reed loving the wife—intensely loving her; he had rather die than
she should live with her husband; hating the husband—he would
break his d–d neck—he would kick hell out of him! Love for the
wife, hate for the husband;—motives potential for evil, potential
for crime; elements in their nature to be kindled into a consuming
fire—the possible elements of a fearful tragedy."

"Threats are significant. Out of the abundance of the heart
the mouth speaketh. Threats unexecuted amount to nothing; but
when the thing threatened is done, and is done as it was threat-
ened, then the fact of the threat becomes an article of circum-
stantial evidence, tending to inculpate the person threatening, the
force and effect of which you must judge. I will break his d—d
neck. The dislocated neck of this victim of wrath and violence,
his beaten and bruised body, show that what was threatened was
done. The question is, was it done by the prisoner thus threaten-
ing, or by some one else from whose lips no threats proceeded.

Love, hate, threats! In what direction do they point? That is
for you to say.

The prisoner has been a witness. He is either innocent or
guilty. If innocent, the truth is his only protection. Truth is
one, and eternal, and indivisible. All true facts are consistent
with each other. There is no reason, if he is innocent, in with-
holding a single truth. There is every reason for uttering it, if
innocent.

If guilty,—if he does not confess—the resort in all cases is and
must ever be to falsehood, evasion, or silence. Falsehood, evasion,
or silence, is evidence of crime. An innocent man does not resort
to falsehood, for falsehood is evidence tending to show guilt.
Each falsehood uttered by way of exculpation, becomes an article
of circumstantial evidence of greater or less inculpatory force,—
the force and effect of which you must determine."

This last clause is quoted in the opinion, but it was thought best
to state more fully the connection in which it was used; the other
passages especially objected to, also appear in the opinion.

The line of argument pursued is indicated by the opinion.

*Wm. H. McCrillis* and *Jno. F. Robinson,* for the respondent.

*H. M. Plaisted,* Attorney General, and *Jasper Hutchings,* County Attorney, for the State.

DANFORTH, J. The exceptions in this case are made up in accordance with a custom somewhat modern in its origin, and of increasing frequency, which has nothing to recommend, but very much to condemn it. We have a full report of the testimony, a large part of which is immaterial; also the entire charge, while the exceptions are of the briefest and most general character, without specification of the points to be raised, or the grounds of objection.

This practice would ordinarily seem to serve no other purpose than that of a drag-net thrown over all the proceedings of a trial, with an apparently desperate hope that something, material or immaterial, might be brought to light and made use of as a valid cause of complaint. While this course very materially increases the expense to the parties, as well as the labor of the court and counsel, it admits at least of a very grave doubt whether it is such a presentation in a summary manner of written exceptions to any opinions, directions or judgments of the presiding justice, as is contemplated by the statute, so as to require any action on the part of the court. But without farther allusion to objections which will be apparent to every one who gives any thought to the subject, as this case is one of so much importance, involving such serious consequences to the respondent, we proceed to examine it upon its merits.

A very large part of the very able and ingenious argument of the respondent's counsel, is based upon the facts as developed by the testimony, and its purpose seems to have been to show that the verdict of the jury has no valid foundation in fact, upon which to rest, and would properly have been addressed to the court upon a motion to set aside the verdict as against the evidence. It is now

settled that this court, sitting as a Law Court, has no jurisdiction of such a motion. *State v. Hill,* 48 Maine, 241. Nevertheless, we have carefully examined the report of the testimony and considered the suggestions of the counsel, and the result is that, in our opinion, if the verdict is erroneous it is only because it should have been for murder in the first degree, instead of the second. The single exception to the charge is made to cover many grounds of complaint in the argument. It will not be necessary to consider them all in detail, as those relating to the treatment of the testimony may be reduced to two classes.

I.   It is claimed that the "charge to the jury was not impartial, and by reason thereof the prisoner had not an impartial trial, to his prejudice."

The prisoner is certainly entitled to a fair and impartial trial, and in case of failure, would have a legal remedy, but whether by exception or otherwise we have now no occasion to inquire. If, in this case, the charge was partial we do not perceive in what way it could have been "to the prejudice of the prisoner," inasmuch, as already stated, the only error apparent in the verdict is that it is more favorable to the prisoner than the testimony would seem to authorize. We do not, however, see the evidence of any such want of impartiality as is claimed. The ground alleged for such complaint is that, "The court unduly called the attention of the jury to the evidence on the part of the State, and unduly instructed the jury as to the force and effect of such evidence and the inferences to be drawn from it, and unduly omitted to call the attention of the jury to the evidence on the part of the prisoner, and the theory of the defence." We find here no allegation of the misstatement of any evidence, but simply an alleged undue instruction as to its force and effect and the inferences to be drawn from it. This must mean either that the comments of the presiding justice were calculated to give the testimony a force and effect to which it was not entitled, and to suggest inferences not authorized, or to give greater prominence to the government testimony than to that introduced in behalf of the prisoner. In either case it fur-

nishes no ground for exceptions. The law of 1874, c. 212, was not in force at the time of the trial before the jury in this case, and whatever may be the proper construction of that statute, the previous decisions in this State and in Massachusetts holding that comments upon the testimony, and even opinions as to its weight decidedly expressed, though erroneous, form no valid ground of exception, are so numerous and uniform in result that it is unnecessary to cite them. But the test of impartiality is not the presentation of the testimony upon the one side and the other as having equal force and effect, or as entitled to the same weight, but rather the presentation of it as it is, with such suggestions arising from it, · as may, in the estimation of the judge, be proper for the consideration of the jury. If the facts bear decidedly one way or the other, a fair presentation of them must show it. If the tower leans, it would hardly be excusable to give the impression, either directly or indirectly, that it stood upright.

The charge undoubtedly bears somewhat strongly against the prisoner, but an examination of the testimony as reported, shows that it is no less decided in its bearing the same way. That this is so, is the fault or misfortune of the prisoner, and not that of the court, and until it shall become the policy of the law that the guilty shall go unpunished, it surely cannot be the duty of the presiding judge to suppress suggestions, arising out of the evidence, which may operate against him, or magnify such as may be in his favor. ·

It can hardly be expected that a judge in his charge shall allude to all the testimony developed during a long trial, or all the circumstances growing out of it, nor is it necessary after a full and careful analysis of it by able counsel. But if any material omission or misstatement occur, it is the privilege and the duty of counsel to call the attention of the court to it at the time, otherwise all grounds of complaint are waived. This duty does not appear to have been neglected in this case, nor the enjoyment of the privilege to its fullest extent denied or abridged.

II. The next objection to the charge we are called upon to con-

sider relates also to the treatment of the facts, and is in most respects like the first. It is in the counsel's brief stated as applicable to many parts of the testimony, but the substance of the complaint may be found in the last two items; that "the court instructed the jury as to the force, effect and weight of the evidence, * * * and instructed the jury what the proof was, to the prejudice of the prisoner" and that "the Court instructed the jury erroneously that certain facts were in evidence."

The ground of this objection, as we learn from the argument, is that the court as matter of law, instructed the jury as to the force, effect and weight of the testimony, as well as that certain facts were in proof, instead of leaving it to their judgment and the inferences to be drawn by them. If this were so, undoubtedly exceptions would lie. To sustain this complaint the counsel has directed our attention to numerous passages in the charge as illustrating his view. It will not be necessary to notice them in detail, as all are substantially the same in principle, and the same suggestions will apply to, and illustrate each.

One of these passages is a repetition of certain testimony of the prisoner and comments upon it as follows: "Certain questions are proposed to which answers are given. What did you suppose their business was? I thought they came to arrest me. You thought they came to arrest you for what? For the murder of John Ray. Does he not stand convicted out of his own mouth? Did he expect to be arrested for the murder of a man whom he thought was alive and absent, hunting or fishing? or was it the irresistible impulse of conscience—the guilty knowledge of crime?" The question first asked by the judge, "Does he not stand convicted out of his own mouth?" standing alone, or in connection with the testimony of the prisoner in relation to his own thoughts, might possibly be taken as an assertion that he was convicted out of his own mouth. But even then it could not be understood by the jury as the statement of a legal proposition. At most, it is a correct statement of so much of the testimony as is repeated, with a calling of the attention of the jury to the inference which might

fairly be drawn from it. The allusion might strike the jury as somewhat emphatic, but not more so than the testimony itself, for that must be considered as most terrible in its emphasis, as bearing upon the guilt of the prisoner. But taking the whole sentence together and, though it loses no force as a suggestion, its force as an assertion, if any it has, entirely disappears. It then becomes a simple proposition to the jury, calling upon them to consider, whether the prisoner was honest in his statement, or whether he had betrayed a knowledge of the crime which was consistent only with his guilt; and it is hardly conceivable that they could have received any other impression than that the inference was to be their own. In this connection we should not forget that the prisoner had previously denied all knowledge of the murder, and had testified that he did not suppose that Ray had been killed but "had gone away, as he usually did, fishing or hunting." This testimony, certainly, revealed a state of mind on the part of the prisoner, which truth and justice required should not be overlooked, the probative force of which was left with the jury, within whose province it was.

The objection that, "the court erred in instructing the jury that certain facts were proved of which there was no evidence," does not appear to be sustained by an examination of the case as reported. Take for example the specification under this head as follows: "The prisoner did not haul goods for Hamilton until winter and that, according to the prisoner's statements, he did not neglect to search for Ray, because he had engaged to haul goods for Hamilton." It had been alleged and proved, as a suspicious circumstance against the prisoner, that while Ray was missing and many of the neighbors were looking for him, the prisoner himself took no part in the search. This would seem to be a matter of some consequence and as such called for an explanation on the part of the defence. It was in alluding to this that the presiding judge made the remarks to which exception is taken. On cross-examination the prisoner does say he hauled goods for Hamilton all the winter and that the arrangements for hauling were made at

Mattawamkeag on the day, but after the search began.   This agree-
ment to haul goods for Hamilton, he also testified, was one of the
reasons why he did not assist in the search.   Thus we find in the
testimony of the prisoner sufficient foundation for the statement
of the judge.   On examination of the charge we find too, that it is
not made to the jury as a statement of fact, but as the prisoner's
explanation of his absence from the search.   His words are :  "He
thus explains his absence ;" and adds, "Is the explanation true ?"
a proper calling of their attention to a circumstance relied upon by
the government as tending to show guilt, with the respondent's
explanation, leaving it for the jury to draw their own inference.
Take another specification under the same head :   "That Ray and
his wife were living together, in harmony, at the time of the mur-
der."   It is claimed that this was stated as a "fact proved of which
there was no evidence."   We find in the case considerable testi-
mony tending to show the manner in which Ray and his wife were
then living together, and what the judge did say upon this point is
thus reported :   "The wife had in August before, been reconciled
to her husband.   Is there any evidence of hostility, of ill-will, of
threats on her part ?   Ray and his wife had become reconciled and
were living together in harmony.   Are not these the true relations
of the parties, as disclosed by the evidence ?   It is for you to
judge."   Whatever might be the effect of the first part of this pas-
sage, taken by itself, it is quite certain that from the last part the
jury must have understood that they alone were the judges of
what the testimony proved, as well as the force to be given to the
facts.

    But without considering in further detail the several objections
properly classed under the head we have been discussing, it is suffi-
cient to say that, so far as we can see, in the light of the very able ar-
gument of the counsel, the remainder rest upon principles similar
to those already examined.   And it will be found that the several
passages of the charge thus objected to, when taken in connection
with the modifying or qualifying sentences with which they stand,
not only have a foundation in the testimony upon which they may

rest, but are not and could not have been understood by the jury as instructions which they were to obey as to the facts proved, or the force and effect to be given to such facts as they might find proved ; but simply comments upon the testimony and such suggestions growing out of it as may have been thought worthy of consideration. More especially when we remember that near the beginning of the charge, alluding to the province of the jury in relation to the testimony, they are reminded that because a fact or circumstance on either side is omitted they are not to forget it, and are told that "What is proved ; what is not proved ; what witnesses are reliable ; what are not reliable ; the force and effect of the testimony ; the inferences to be drawn therefrom ; I leave entirely to you. Amid this mass of conflicting testimony, I mean to give neither opinion nor the intimation of an opinion as to what the truth may be ; what each witness may have said, and the necessary and inevitable inferences to be drawn therefrom, I submit to your calm, deliberate and conscientious judgment, acting as you are, under the solemn sanction of the oaths you have taken, and in the discharge of a high public trust ;" that this, in substance, was repeated during the charge, as applicable to particular portions of the testimony, and in some of the passages specially objected to, and near the close they are again reminded that they must determine "whether the facts on the one side or the other are proved," that for the "inferences from those facts" they are responsible, we must come to the conclusion that there is no possible ground for supposing that the jury did not fully understand their rights and responsibilities in relation to the testimony, or were in that respect misled by the charge.

III. The next objection is mainly, if not entirely, one of law, and in the brief is stated in these words : "The court erred * * * in instructing the jury that the words of Hayford to the prisoner : 'Every body suspects you, I suspect you,' was a charge of murder against the prisoner, and erred in instructing the jury that the prisoner remained silent under the charge, and erred in instructing the jury that by the law, the inference to be drawn from

the charge and the silence, was that the charge was true." So far as the facts are concerned there appears to be a sufficient foundation for the instruction in the testimony. No doubt as to the fact that he was told that he-was suspected, is suggested. His silence is not denied. A suspicion of crime conveyed to the prisoner is so nearly similar to a charge of having committed the crime that the jury would not be misled, especially when their attention is directed to the testimony upon which the remark is predicated ; and whether it was a suspicion or charge, the same law would be applicable. The probative force of the fact would be the same in either case; or, if different, it would differ in degree only. The law given was correct, and the jury would judge for themselves as to the weight to be given to it. The instruction as given differs somewhat from the statement in the objection. It is introduced by the remark of the presiding judge that "It is not merely what the prisoner says or does, but what he omits to do or say that may become facts evidentiary of guilt." Then, after alluding to the facts as shown by the testimony, he says further : "What is the law ? A statement is made either to a man, or within his hearing, that he was concerned in the commission of a crime, to which he makes no reply ; the natural inference is that the imputation is well founded, or he would have repelled it." This is a quotation from Best on Presumptions, § 241, affirmed in *State v. Cleaves*, 59 Maine, 300-1, and its justice and propriety are there so fully illustrated that we deem it unnecessary to add any thing to what is there said.

IV. It is further objected that the court erred in the instruction as to "what constituted a reasonable doubt." The explanations of the meaning of this phrase have been almost innumerable, and the best jurists have found it difficult to convey to their own satisfaction the idea in their own minds expressed by its use. Not that there is any considerable difficulty in understanding its meaning, but rather in not conveying it. It may indeed admit of grave doubt whether the proposition is in itself so simple and the words so well calculated to express a state of mind so easily felt, though difficult to describe, that in most cases it is sufficient to use the

expression alone without any attempt at explanation. All such attempts must result in simply stating the same proposition in a different form of words, and words which are, perhaps, no more easily understood.

There is no exact mathematical test by which we may certainly know whether a doubt, entertained in any given case, is reasonable or otherwise. What would be reasonable to one person might be far otherwise to another. Therefore, no certain line, as upon a plan, can be drawn, that shall be recognized by every one, as the dividing line between the mere skeptical doubt and that which has the sanction of reason. Hence, whatever explanations may be given to the phrase, its meaning practically must depend very largely upon the character of the mind of the person acting. Lexicographers tell us that reasonable is that which is "agreeable or conformable to reason." The doubt, therefore, which conforms to the reason of the person examining, is to him a reasonable doubt. If it does not so conform, to him it is unreasonable, and will not be entertained. We must assume that the jurors are reasonable men, and as such they must be addressed. When told that, in order to convict, the proof must remove every reasonable doubt of guilt from their minds, whatever the form of words used, if any heed is given to the instruction the result must be that each individual juror will understand it and act according to the dictates of his own reason; and if, tried by that test, the doubt is reasonable, conviction must fail; otherwise it would follow.

In this case the objection is made, not so much to the inaccuracy of the definition as to its incompetency; not that it gives erroneous instruction to the jury, but that it leaves out an important element necessary to give the jury a full understanding of their duties in this respect; namely, the moral certainty of the truth of the charge to authorize conviction. It is true that this form of words is often used, and it may be conceded that the phrase itself contains this element, and any explanation without it would be inadequate. In *Commonwealth v. Webster*, 5 Cush., 320, Shaw, C. J., says: "It is that state of the case which, after the entire comparison and con-

State *v.* Reed.

sideration of the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge." Again, in the same case, he says : "But the evidence must establish the truth of the fact to a reasonable and moral certainty." A writer in No. Am. Review for January, 1851, p. 201, reviewing Webster's trial, thinks a reasonable doubt may perhaps be better described by saying, that all reasonable hesitation in the minds of the triers, respecting the truth of the hypothesis attempted to be sustained, must be removed by the proof." Other definitions almost without number might be cited but all, though different in words, are to the same effect, and all describe an absence of reasonable doubt, as a state of mind existing in the jurors amounting to a reasonable and moral certainty, in distinction from an absolute certainty. The certainty need only be reasonable though it must be moral, and as reasonable it must and can only conform to the reason as it exists in each particular juror.

Is, then, the explanation of a reasonable doubt in the case at bar open to the objection made ? Is the element of reasonable and moral certainty absent ! If the foregoing views are correct, how must the jury have understood it ? They were in the first instance plainly told that "the guilt of the prisoner must be established beyond a reasonable doubt." The presiding justice then proceeds : "The question at once arises, what is a reasonable doubt ? It is a doubt which a reasonable man of sound judgment, without bias, prejudice, or interest, after calmly, conscientiously and deliberately weighing all the testimony, would entertain as to the guilt of the prisoner." To make it more clear, the jury are then fully cautioned against a mere "possibility of a doubt," as also "fanciful suppositions and remote conjectures, that facts may exist where there is no proof whatever."

Assuming, as we have already seen that we must, that the jurors are reasonable men, and that as the instruction requires, they have, without bias, prejudice or interest, calmly, conscientiously and deliberately weighed all the testimony, and found no doubt which

they could or "would entertain," what can be more satisfactory evidence that their minds are in that state of "reasonable and moral certainty" descriptive of a conviction "beyond a reasonable doubt."

But if this were not so, the prisoner would have no reason to complain, for if the explanation is faulty, it is too favorable for him. It is very clear that any doubt which a reasonable man would refuse to entertain after having examined the case with the thoroughness, care, and freedom from prejudice, required by the instruction, could not be a reasonable one ; while on the other hand, such a man under such circumstances, might entertain a doubt which would not be reasonable, and if so, the instruction would give the prisoner the benefit of that. It would in fact give the prisoner the benefit of every doubt which a jury under such circumstances might entertain, which would in that respect give him certainly all he was entitled to, with a possibility, perhaps not very remote, of much more than he could legally ask.

There is still another answer to this objection, which is conclusive. The complaint is of an omission, a leaving out, of an element which should have been put in. If that were true, the counsel should at the time have requested the additional instruction desired.

V. Complaint is made that the jury were instructed "that an innocent man does not resort to falsehood." Precisely how the prisoner could be prejudiced by this remark does not appear. As a general rule it is true, though it may be liable to exceptions. But the objection, as it stands in the brief of the counsel, sets out only a part of the sentence as used by the judge, and when the remainder of the sentence and the connection in which it is used, is added, it will clearly appear, not only that no injustice could come to the prisoner from it, but that it is simply an expression of well settled law, that a resort to falsehood in relation to a crime with which a man stands charged, is to be taken as proof of guilt. The passage in the charge reads as follows : "There is no reason if he is innocent, for withholding a single truth ; there is every

reason for uttering it, if innocent. If guilty, if he does not con-
fess, the resort in all cases is, or must ever be, to falsehood, evasion
or silence. Falsehood, evasion or silence is evidence of crime.
An innocent man does not resort to falsehood, for falsehood is
evidence tending to show guilt. Each falsehood uttered by way
of exculpation becomes an article of circumstantial evidence, of
greater or less inculpatory force, the effect of which you must
determine."

VI. The refusal to give the requested instructions. This objec-
tion is not founded upon a refusal to give the law as requested, but
that the law was given in a general statement, and not in detail as
required by the request. When the same law is applicable to
several different facts, as in this case, when the counsel had stated
in different requests, different facts claimed by the government to
have been proved, and then a request in each case, that such fact
cannot be considered by the jury, unless it is so proved beyond a
reasonable doubt, it is a sufficient compliance to instruct the jury
that every circumstance relied upon to prove the guilt of the
prisoner, "before it can be taken into account must be established
beyond a reasonable doubt." Such instruction was given with the
remark, after reading the requests, that "with regard to those, I
give you a general rule of law." As the prisoner actually obtained
all he asked, we see no cause for exception.

VII. It is objected that Mrs. Ray and John R. Boynton were
permitted "to testify what their reasons were for committing perjury
on a former trial of the prisoner." It seems that for the purpose
of impeaching these two witnesses, the defence had put in their
testimony given on a former trial of the respondent, which was
somewhat contradictory to that now given. To meet this phase
of the case, the witnesses were permitted to explain the circum-
stances under which their former testimony was given. A state-
ment contradictory to that given by the witness upon the stand,
may of course be shown as impeaching testimony. But its force
must depend very materially upon the circumstances under which
it was made, and the influences at the time bearing upon the wit-

ness. It would therefore seem to be self-evident that witnesses so situated, should be permitted to make such explanation as might be in their power. The first impulse of the mind in such case, is to enquire how this happened; what reason can be given, and more especially what can the party implicated say in excuse or extenuation. To refuse the opportunity to explain, would be in effect to condemn a party without a hearing, and without that information, which in many cases, would be material to a correct judgment. So clear is this proposition that we do not find any case in which the question seems to have been raised, but many in which it is assumed as an undeniable proposition. 1 Greenl. on Ev., § 462; *Commonwealth v. Hawkins*, 3 Gray, 465; *Gould v. Norfolk Lead Co.*, 9 Cush., 347.

VIII. Mrs. Ray was permitted to testify that she told the counsel for the prisoner that she "had no hand in the deed; no hand in the act of killing;" subject to objection. This as the case shows, was a part of the explanation referred to under the last objection, and as such, was clearly admissible. It is true, a part of this explanation was excluded, which if admitted, as it should have been, would have rendered the whole more intelligible and useful for the purpose intended. But as the part was excluded in consequence of the persistent objection of respondent's counsel, it gives him no cause of complaint.

Upon another ground, independent of its connection with the explanation, it is admissible. The testimony now objected to, is an affirmation of that given upon the stand at this trial. After the attempt to impeach her, on re-examination she gives the answer objected to, showing that at or about the time of the homicide her statement as to her own participation in the affair, was the same as at the trial. This brings it within the decision in *Commonwealth v. Wilson*, 1 Gray, 340.

IX. Elder French, a witness, and also the magistrate before whom the prisoner's preliminary examination was had, was asked by counsel for defence whether Benjamin York, a witness at that examination, stated "anything about tracks there." On objection

the question was excluded.  As Benjamin York does not appear to have been a witness at this trial, we are unable to see any ground on which his statements, or want of statements, then become material here.  The case shows that all the other testimony in relation to the tracks, given at that examination, and offered at this trial, was admitted, and not excluded, as suggested by the counsel's brief.

We have examined and carefully considered all the points made in the counsel's argument, whether herein particularly specified or not, and can find no ground on which exceptions can be sustained.                              *Exceptions overruled.*

APPLETON, C. J., CUTTING, BARROWS and PETERS, JJ., concurred.