PAUL N. DWYER, PETR.
*vs.*
STATE OF MAINE

Oxford.    Opinion, September 22, 1958.

*Merton E. Rawson,* for plaintiff.

*Frank F. Harding,*
*Roger A. Putnam,* for defendant.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, DUBORD, JJ. SIDDALL, J., did not sit.

SULLIVAN, J.  On December 2, A. D. 1937 the petitioner, then on trial for the murder of Dr. James G. Littlefield, retracted his recorded plea of not guilty, pleaded guilty and was adjudged guilty. He was sentenced to life imprisonment and has been continuously confined in execution of that sentence.

On April 8, A.D. 1957 the petitioner sought a writ of error *coram nobis* and in May, 1957 such a writ was issued. He alleged that his plea of guilty had been wrung from him by the duress and intimidation of Francis M. Carroll, a deputy sheriff, that legal counsel assigned to him by court appointment for his murder trial had been incompetent and that during his detention and trial he had been held incommunicado in derogation of his constitutional rights. A hearing before a justice has been had upon the writ and the petitioner then offered testimony which at the objection of the State was excluded. The petitioner excepted to such a ruling and now after a decision upon the writ affirming the court judgment of December 2, A.D. 1937 prosecutes his exceptions.

After the conviction of the petitioner in 1937, Francis M. Carroll, the deputy sheriff accused by the petitioner of having terrorized and quite reduced the latter to a status of automaton, was in 1938 indicted, tried and convicted of the murder of the same Dr. James G. Littlefield. At the trial of *State* v. *Carroll*, E. Walker Abbott, an attorney who had represented the petitioner in his trial for Littlefield's murder in 1937, was called by the State as its witness. Abbott died in March, 1953 long prior to the hearing in the present controversy. A transcript of his testimony on direct and cross-examination in the Carroll trial was the evidence offered by the petitioner at his hearing on the writ of error

*coram nobis* and excluded by the court. The content of Abbott's testimony was such as to make it, if admissible, rationally pertinent to all three of the petitioner's charges in the instant case. Before the offer of such evidence the petitioner in this proceeding had testified extensively in support of his charges. He had been cross-examined and much testimony, documentary and real evidence of contradictory and impeaching potential had been introduced by the State. The testimony of Abbott was offered by the petitioner as proper to his position that the issues of coercion of Dwyer by Carroll and of the isolation of Dwyer were waged alike both in the trial of *State* v. *Dwyer* and in that of *State* v. *Carroll*. The Abbott testimony was opposed by the State for the stated reasons that neither the parties nor the issues were the same in the trials of *State* v. *Dwyer* and *State* v. *Carroll*. Before ruling the justice admitted the record of all the evidence in the case of *State* v. *Carroll* on behalf of the petitioner here for the strictly contained purpose of ascertaining the veritable issues entertained in the Carroll trial. The court thereafter upheld the State's objection and excluded Abbott's testimony.

The record reveals that quite at the outset of the trial of *State* v. *Carroll* the State called the present petitioner as its witness. Dwyer at the very time stood convicted of the murder of Dr. James G. Littlefield by a judgment of record in the very tribunal which was then trying Carroll for the same crime. It has never been doubted or disputed that the court had jurisdiction of the respondent and of the crime in the cast of *State* v. *Dwyer*. Yet, at the Carroll trial the State attorney conducting the prosecution, with little ado and summarily, asked the following abrupt questions and, without interference, elicited the following responses:

"Q. Your name is Paul N. Dwyer?
A. Yes, sir.

Q. You are now an inmate of the State of Maine Prison at Thomaston?
A. Yes, sir.

Q. Did you murder (sic) Dr. Littlefield?
A. No, sir, I did not.

Q. Did you see him murdered (sic)?
A. Yes, sir.

Q. Do you know who murdered (sic) him?
A. Yes, sir.

Q. Who did?
A. Francis Carroll.

Q. The respondent at the bar here?
A. Yes, sir."

Prescinding from the form of certain of the foregoing interrogatories and from the propriety of a collateral attack upon an abiding judgment of that same court we may say that the record of the Carroll trial conclusively demonstrates that issues injected by the State and persistently entertained by the court were the innocence or guilt of Dwyer, the duress or spontaneity of his guilty plea made at his own trial some nine months before and the undue sequestration of Dwyer after his arrest. The State assumed and appropriated the dual burden of exculpating Dwyer for the nonce while convicting Carroll and the former effort was logically and correlatively necessary to the latter because of the extraordinary nature of the trial. The testimony of Abbott supplied by the State at the Carroll trial related to avowed coercion and duress by Carroll upon Dwyer from the killing of Dr. Littlefield to the pleading of Dwyer, to the asserted isolation of Dwyer pending trial and to a professed consistency of statements by Dwyer as to his domination by Carroll to the time of Dwyer's plea. There can be no doubt that the foregoing issues tolerated in the

Carroll trial are the matters now in controversy in the case at bar.

The parties arrayed against each other in the current hearing of *Dwyer* v. *State* and those of the trial of *State* v. *Carroll* are not the same. Nothing could be more obvious. Nor was there any privity in the legal sense between Carroll and Dwyer. However, the State was and is a party in both cases. The State presented E. Walker Abbott as its witness in the Carroll trial and was accorded and exercised a plenary function of direct examination. The State regarded the demonstration of a complete mental ascendancy by Carroll over Dwyer and the impugning of the previously adjudicated guilt of Dwyer as necessary premises to be proved as part of its case against Carroll. We are concerned here with the rules of evidence. The proper object of such a science is truth and its establishment with due acknowledgment and satisfaction of the rights of all parties. Unless the rules are adapted to those ends they fail of their purpose and become rote. The transcript of the testimony given at the Carroll trial by the deceased E. Walker Abbott at the behest of the State was offered by this petitioner in this case. In so far as the fair quest of truth is the objective, the exercise by the State in the *Carroll* case of its rights of direct examination of Abbott upon the very issues now raised for resolution in this case preempts any just claim of the State now to oppose the admission of such evidence because of any lack of opportunity to examine or cross-examine. The petitioner does not protest the unavailability of cross-examination and the State cannot with justification contend that it is at all prejudiced. Although the parties in the case at bar and in the *Carroll* case are not identical such a difference does not affect the admissibility of the evidence under discussion.

"- - - - If the party against whom the evidence is offered, examined the witness on the former trial,

it is immaterial whether the examination was direct or cross-examination."

31 *Corpus Juris Secundum,* Evidence, § 390, P. 1197.

"Since defendant examined the witness on the (former) trial, it is immaterial whether it was direct or cross, so far as this question is concerned."

*Louisville & N. R. Co.* v. *Scott* (1935), (Ala.), 167 So. 572, 576.

Wigmore on Evidence, 3rd ed., Volume V, § 1389, P. 105, rationalizes the topic thus:

"Finally, the whole notion of cross-examination refers to one's right to probe the statements of an opponent's witness, *not one's own witness;* thus, if A has taken X's deposition or called X to the stand, and B has cross-examined, it is not for A to object that he has not had the benefit of cross-examination; *that benefit was not for him nor needed by him;* it was intended only to protect against an opponent's witness, who would be otherwise unexamined by A; and *if A has had the benefit of examining a witness called on his own behalf, he has had all that he needs,* and the right to probe by cross-examination is B's, not A's." (Emphasis supplied.)

The Wisconsin Court in construing its statute upon this subject held that, not only by reason of the statute, but "as well as under well recognized principles" the following is the correct doctrine:

"- - - - Though such statute provides that in certain situations the testimony of a deceased witness or one absent from the state may be admitted in re-trials or subsequent proceedings where the issue is substantially the same and where the party against whom it is offered shall have had an opportunity to cross-examine, yet here the present offer is as against those who, when the depositions

were taken, *had the opportunity of direct exami-nation — a substantial equivalent."* (Emphasis supplied.)

*Roberts* v. *Gerber* (1925), 187 Wis. 282, 290; 202 N. W. 701, 704.

*State* v. *Brinkley* (1945), (Mo.), 189 S. W. (2nd) 314 was a prosecution for perjury. The respondent on his trial offered in evidence a deposition of an absent witness, taken by the respondents in a manslaughter case in which the respondent, Brinkley, had not been a party but upon an issue presenting the same questions of fact upon the same evidence in both the manslaughter and perjury cases. The State had been afforded the opportunity to cross-examine the deponent. The deposition was ruled admissible. The court said:

P. 329.

"The conclusion reached in this Brown case (State v. Brown, 331 Mo. 556, 559, 56 S. W. 2d 405, 407) was that 'precise nominal identity of all the par-ties' and 'precise technical identity of the charge' are unnecessary; but that the issue—the offense charged—must be substantially the same in both cases, so that the challenged testimony is admis-sible in both; the testimony must have been under oath; and the adverse party must have had an op-portunity to cross-examine."

Nor is the generality of a principle of *State* v. *Budge* (1928), 127 Me. 234, 240, impinged by our conclusions here. Attendant factors in this case were absent in *State* v. *Budge* and their presence here dissipate the mischiefs which neces-sitated the application of the normal rule in *State* v. *Budge* requiring an identity of parties in both the case where testi-mony of a witness later deceased was taken and in any other where it is sought to be used.

Because of our conclusions founded upon the foregoing facts, reasoning and authorities we hold that the presiding

justice in this case, in a complex cause beset with perplexing difficulties not hitherto fully resolved in this jurisdiction erred in the reasons recited by him to vindicate his exclusion of the Abbott testimony. The error was one of law. *Edgeley* v. *Appleyard* (1913), 110 Me. 337, 339; *Chase* v. *Springvale Mills Co.* (1883), 75 Me. 156, 160.

The rejected testimony contained unlike components. A part was supplied from the witness's personal observation and experience. Abbott related that the respondent, Carroll, during Abbott's interview with Dwyer concerning Dwyer's imminent guilty plea hovered as guard about Dwyer. Abbott in response to the inquiry of the justice presiding at the Carroll trial conceded to the latter that he, Abbott, attorney for Dwyer at Dwyer's trial, did not inform the justice presiding at Dwyer's trial of Dwyer's voiced motivation to plead guilty because of Carroll's threats. Such evidence was at least germane to Dwyer's current claims of having been inordinately restricted and of having been afforded incompetent counsel.

A portion of Abbott's unaccepted testimony constituted a repetition by Abbott of communications which, he swore, had been made to him in his office of trial counsel at Dwyer's trial and before plea, by Dwyer expressing Dwyer's determination to plead guilty and which essayed to afford a consistency to Dwyer's insistence upon the abject fear to which Carroll had subjected him from the time of Dr. Littlefield's violent death to Dwyer's plea. In the instant case it is Dwyer's contention that he was never guilty of the crime which he acknowledged and that his plea was not in fact voluntary. Contradictory statements and cross-examination have challenged his direct testimony here. These communications to Abbott are purported consistent statements of Dwyer whose credibility has been attacked by evidence that he has made several statements inconsistent with his testimony in this case.

There are few subjects in the law of evidence more difficult of analysis, comprehension or reconciliation than that of permissive corroboration of a witness by his consistent statements. Annotation, 140 A. L. R., pp. 21 to 186. Our own court has decided several cases involving the topic.

In *Ware* v. *Ware* (1831), 8 Me. 42, 55, we find:

"- - - The authorities cited clearly establish the principle that an impeached or contradicted witness cannot be supported by the party who called him, by proof of his declarations made at other times and to other persons, coinciding with his testimony. Such being the case, we do not in the present instance, *see any reasons for considering it as removed from the influence of the general principle*. Indeed it would seem objectionable on another ground, namely, that such declarations were mere expressions of the opinions of those witnesses as medical men; all which kind of evidence was excluded on the trial when offered to prove insanity, excepting the opinions of the subscribing witnesses to the will as before mentioned." (Italics supplied.)

*Scott* v. *Blood* (1839), 16 Me. 192, was a case concerned with proof of partnership declarations and admissions of a person acting as partner to prove the partnership. At page 198, the court said by way of dictum:

"We think a more correct view of this subject was taken by this Court, in the case of Ware v. Ware, 8 Greenl. 42, - - - and the Court considered the principle clearly established, that an impeached or contradicted witness cannot be supported by the party who called him, by proof of his declarations made at other times, and to other parties, coinciding with his testimony."

In *Smith* v. *Morgan* (1853), 38 Me. 468, 471, it is said:

"The disclosure of Hyde was offered by the plaintiff, to prove what Hyde did say concerning the note, at

the time of the disclosure, and all he said about it, but it was held inadmissible. The only effect, which this disclosure could have had, so far as we can perceive, was to corroborate the testimony of Hyde given in his deposition. The only corroboration which it would afford was, that on a former occasion he made statements, not inconsistent with those made in his deposition and by the plaintiff in this case. On no principle is such evidence for such a purpose admissible."

*State* v. *Reed* (1874), 62 Me. 129 was the third trial of the same murder indictment. This court considered the testimony of 2 witnesses for the State at the last trial of the cause.

P. 131.

"At the former trials Mrs. Ray had denied all knowledge of how her husband had come to his death, but she was now called as a witness by the prosecution, and stated that the prisoner came to her door in the evening of the twentieth of September, 1870, and said to her, 'I have committed a horrible deed to-night;' and, on her asking what he had done, said he had got into a fight with her husband, and had killed him; and that if she told, the body would be put where it would cause the murder to be laid to her; that he was driving their cow out of his field, when he met Ray coming after her, upon the flat down under the hill; that they had some words, and then got into a smart fight, and he (Reed) struck him (Ray) with a club, and killed him.

"The defence introduced her testimony given at the first trial, when she swore to her husband's passing Tuesday night (the twentieth) in the house, and her knowing nothing of him after he went out early Wednesday morning, the twenty-first day of September, 1870. The government recalled her, and against the objection of the defendant, she was allowed to explain her conduct by saying that she was afraid to testify to the truth at the first trial,

and was advised not to do so by a gentleman then acting as counsel for Reed; the State's attorney also proposed to show the advice given and a threat that, if she stated the truth, Reed would turn State's evidence against her; and that she was persuaded to go blueberrying at the time of the second trial, so as to avoid being summoned by the State; but the court would not admit this testimony. Another witness, a boy who testified to seeing Reed down on the shore, under the bank opposite Ray's house, on the Tuesday night that Ray disappeared, was contradicted by the minutes of his statement at the first trial, that it was another night; he was allowed to explain by saying that the prisoner's sister told him that he did not see Eldridge (the respondent) down there that night, and if he said he did, she would get right up and stave his story all to pieces.

P. 146.

"VII. It is objected that Mrs. Ray and John R. Boynton were permitted 'to testify what their reasons were for committing perjury on a former trial of the prisoner.' It seems that for the purpose of impeaching these two witnesses, the defence had put in their testimony given on a former trial of the respondent, which was somewhat contradictory to that now given. To meet this phase of the case, the witnesses were permitted to explain the circumstances under which their former testimony was given. A statement contradictory to that given by the witness upon the stand, may of course be shown as impeaching testimony. But its force must depend very materially upon the circumstances under which it was made, and the influences at the time bearing upon the witness. It would therefore seem to be self-evident that witnesses so situated, should be permitted to make such explanation as might be in their power. The first impulse of the mind in such case, is to inquire how this happened; what reason can be given, and more especially what can the party implicated say in excuse or extenuation. To refuse

the opportunity to explain, would be in effect to condemn a party without a hearing, and without that information, which in many cases, would be material to a correct judgment. So clear is this proposition that we do not find any case in which the question seems to have been raised, but many in which it is assumed as an undeniable proposition. 1 Greenl. on Ev., § 462; Commonwealth v. Hawkins, 3 Gray, 465; Gould v. Norfolk Lead Co., 9 Cuah., 347.

"VIII. Mrs. Ray was permitted to testify that she told the counsel for the prisoner that she 'had no hand in the deed; no hand in the act of killing;' subject to objection. This as the case shows, was a part of the explanation referred to under the last objection, and as such, was clearly admissible. It is true, a part of this explanation was excluded, which if admitted, as it should have been, would have rendered the whole more intelligible and useful for the purpose intended. But as the part was excluded in consequence of the persistent objection of respondent's counsel, it gives him no cause of complaint.

"Upon another ground, independent of its connection with the explanation, it is admissible. The testimony now objected to, is an affirmation of that given upon the stand at this trial. After the attempt to impeach her, on re-examination she gives the answer objected to, showing that at or about the time of the homicide her statement as to her own participation in the affair, was the same as at the trial. This brings it within the decision in Commonwealth v. Wilson, 1 Gray, 340."

*State* v. *Reed* in the same year was followed by *Powers* v. *Cary* (1874), 64 Me. 9, containing this pronouncement:

P. 18.

"VII. The plaintiff introduced the declarations of Annie G. Cornelison, contradicting what was stated in her affidavit, and that she did not know what was contained therein.

"The defendant offered to prove her declarations at the time in accordance with her affidavit, and that the affidavit was read to her and assented to by her as true. The evidence was excluded.

"It is well settled that a witness who is impeached cannot be corroborated by proof that at other times he has made statements in accordance with his present testimony. The discredit arising from contradictory statements still remains. Com. v. Jenkins, 10 Gray, 485."

We shall take occasion hereinafter to advert to *Com.* v. *Jenkins,* cited in *Powers* v. *Cary.*

*Sidelinger* v. *Bucklin* (1875), 64 Me. 371 was a bastardy action in which the complainant's mother was permitted to testify that the complainant told her in May who was the child's father. The complaint was formally made in June. The mother was asked: "Since the making of her accusation in writing, whom has she accused of being the father of the child?" and was permitted to answer: "Moses R. Bucklin." The witness then told that her daughter had always accused the respondent of being the father of the child, whenever she discussed the subject with her. The court decided:

P. 372.

"- - - Such declarations are not admissible to prove that 'she has continued constant in such accusation' as they have no tendency to do so. They are entirely consistent with any number of different accusations.

"Nor are they competent to sustain her credibility as a witness, the purpose for which they seem to have been used; for if her statements under oath are of doubtful credit, they would be no less so without that sanction. Nor could they be strengthened by any number of repetitions. 1 Greenl. on Ev., § 469, and cases cited in the note to that section.

> "Nothing appears in the case *to make them an exception to the general rule* excluding declarations of parties in their own behalf, or of witnesses generally, made out of court." (Italics supplied.)

We call attention to the words in the last paragraph above, "nothing appears in the case to make them *an exception to the general rule.*"

*Hurd v. Fire Insurance Co.* (1942), 139 Me. 103, was an action to recover on a policy. We quote from Page 117 of the opinion:

> "The letter Campbell (agent of defendant) wrote to the defendant and enclosed with the application, unknown to the plaintiff, and questions asked Campbell with reference thereto, were properly excluded. Letters written by a contradicted witness to his employer, unknown to the other interested party, and offered in evidence by the employer who called the witness to testify, are not admissible although they coincide with the testimony of the witness at the trial. Pulsifer v. Crowell, 63 Me., 22.

> "In such circumstances, the contents of the letters are but the declarations of the witness himself, and are inadmissible to bolster up his own testimony. They are entitled to no greater respect than his oral declarations to others at other times and places, which are clearly inadmissible. Ware v. Ware, 8 Me., 42; Scott v. Blood, 16 Me., 192, 198; Powers v. Carey, 64 Me., 9, 19."

*Pulsifer* v. *Crowell,* cited by the court in *Hurd* v. *Fire Ins. Co.,* above, was decided upon the holding that the evidence rejected was *res inter alios acta* and the language as to the inadmissibility of a witness' own statements in corroboration of his testimony was dictum. The other authorities cited in the *Hurd* case we have reviewed and will consider further.

In *State* v. *Reed, supra,* two of the State witnesses were allowed upon redirect examination, after their cross-examination had quite clearly discovered former contradictory statements by each witness, "to testify what their reasons were for committing perjury on a former trial of the prisoner." "The witnesses were permitted to explain the circumstances under which their former testimony was given." One witness "was allowed to explain her conduct by saying that she was afraid to testify to the truth at the first trial, and was advised not to do so by a gentleman then acting as counsel for Reed." The other witness was "allowed to explain by saying that the prisoner's sister told him that he did not see Eldridge (respondent) down there that night, and if he said he did, she would get right up and stave his story all to pieces."

In the instant case Dwyer testified that he was innocent. He was confronted on cross-examination as well as by other independent evidence, with contradictory statements made by him. By the Abbott testimony he seeks to prove that, within a few weeks of the homicide and before his guilty plea, he told his counsel of his fear of Carroll and of his compulsion to plead because of it alone. Dwyer was permitted the opportunity to explain his contradictory statements as were the witnesses in *State* v. *Reed* and further seeks to utilize the testimony of Abbott in corroboration.

*Powers* v. *Cary, supra,* decided in the same year (1874), as *State* v. *Reed* and holding that a witness who is impeached cannot be corroborated by proof that at other times he has made statements in accordance with his present direct testimony cites *Commonwealth* v. *Jenkins,* 10 Gray, 485. In that often quoted and cited Massachusetts case the prosecution sought to corroborate the direct testimony of its witness who upon a preliminary examination in the police court had given testimony at variance with his direct testimony at the trial on the indictment and had been cross-

examined about it. The State offered earlier statements of the witness to third persons concerning the transactions he had testified about in direct examination. The court opinion excludes the corroborative statements but then proceeds to advise:

P. 489.

> "The decision of the point raised in this case is not to be understood as conflicting with a class of cases, in which a witness is sought to be impeached, by cross-examination or by independent evidence, tending to show that at the time of giving his evidence he is under a strong bias or in such a situation as to put him under a sort of moral duress to testify in a particular way. In such case, it is competent to rebut this ground of impeachment and to support the credit of the witnesses (sic) by showing that, when he was under no such bias, or when he was free from any influence or pressure, he made statements similar to those which he has given at the trial. Another similar class of decisions, resting on a like principle, is also to be distinguished from the case at bar, namely, when an attempt is made to impeach the credit of a witness by showing that he formerly withheld or concealed the facts to which he has now testified. In such cases, it is competent to show that the witness, at an early day, as soon as a disclosure could reasonably have been made, did declare the facts to which he has testified. Such in substance was the case of Commonwealth v. Wilson, 1 Gray, 340. The statement in the exceptions, of the circumstances under which the evidence objected to in this case was admitted, carefully excludes all facts which would bring it within either of the above classes of decisions."

In *Sidelinger* v. *Bucklin, supra,* our court in excluding the testimony offered said:

> "Nothing appears in the case *to make them an exception to the general rule* excluding declarations of parties in their own behalf, or of witnesses generally, made out of court." (Emphasis supplied.)

*Commonwealth* v. *Retkovitz* (1915), 222 Mass. 245:

P. 249.

"The mere fact that a witness has made statements on other occasions at variance with testimony given in court does not warrant the introducing of confirmatory evidence to the effect that he has given an account of the transaction at still other times in harmony with his sworn testimony. A party may, for the purpose of discrediting an opponent's witness, show that he has given two inconsistent narrations of the same affair, one of which was necessarily untrue. As is pointed out with clearness by Bigelow, J., in Commonwealth v. Jenkins, 10 Gray, 485, 488, when this is the state of the evidence it by no means relieves the witness of the distrust thus cast upon him to prove that the story last told was similar to an earlier version given by the witness. The two inconsistent statements still remain. Hence, under these circumstances, such corroborating evidence is inadmissible. *This is the general rule.* But there is an *exception where the contention is made that the testimony of a witness is given under a bias or under influence arising from some late occurrence subsequent to the main event, is a recent contrivance or that the facts described in testimony previously have been concealed under conditions which warrant the belief that, if they were true, the witness would have been likely to have revealed them.* In such a situation, evidence that the witness at earlier times before the intervention of these pernicious impulses had made statements like those given in court has a legitimate tendency to impugn the existence of these factors as operating causes to produce the testimony and thus to fortify his testimony, and therefore should be admitted. The exception to the general rule is a narrow one and is not to be extended; but, when the contentions of the parties give rise to its application, it is well established. Griffin v. Boston, 188 Mass. 475. Brown v. Brown, 208 Mass. 290. See for a full discussion of all the principles, Com-

monwealth v. Tucker, 189 Mass. 457, 479 to 485."
(Emphasis supplied.)

*Wilson* v. *Jeffrey* (1951), 328 Mass. 192, states the rule as to such evidence and the exceptions as follows:

P. 194.

"- - - The general rule with certain exceptions is well established that a witness whose testimony is contradicted is not entitled to bolster up his testimony and enhance his credibility by showing that he had previously made statements consistent with his testimony. Deshon v. Merchants' Ins. Co., 11 Met. 199, 209. McDonald v. New York Central & Hudson River Railroad, 186, Mass. 474, 478. Commonwealth v. Tucker, 189 Mass. 457, 479-485. The exceptions to the rule were stated in Walsh v. Wyman Lunch Co. 244 Mass. 407, 409, as follows: 'where it is claimed that the testimony is a recent invention or fabrication, or was given under bias or undue influence, or that the facts described in the previous testimony have been concealed under conditions which warrant the belief that, if true, the witness would have stated them.' Commonwealth v. Jenkins, 10 Gray, 485, 488. Griffin v. Boston, 188 Mass. 475. Smith v. Plant, 216 Mass. 91, 102-103. Ananian v. Melkon, 230 Mass. 322, 326. Commonwealth v. Corcoran, 252 Mass. 465, 487. Kelley v. Boston, 296 Mass, 463, 465."

There is a division of authority generally but the weight of authority supports the *general* rule of exclusion. 140 A. L. R. 49 and cases cited.

As to the *exceptions* to the general rule:

"When a witness has been impeached by an earnest and sustained attack upon his credibility, tending to show that his testimony is a fabrication of recent date, or is colored, distorted, and falsified through the influence of some strong personal motive, interest in the litigation, or relation to the litigant, it is now nowhere seriously disputed but

that such witness may be corroborated by rebutting evidence of his statements consonant in substance with his testimony, made on occasions so near to the event involved, and so long anterior to the litigation, that the effect of his speech could not have been foreseen, when his remarks were made at times clearly anterior to the existence of the compromising bias alleged to impair his credibility." 140 A. L. R. 184.

In the instant case some of the principal evidence for the contradiction of the petitioner was offered by the State and admitted by the court upon the State's theory that such evidence, if given credence, would impeach the credibility of Dwyer, would be inconsistent with his testimony, would be consistent with his guilty plea and negate coercion and would manifest a "pattern of conduct on the part of the petitioner from the time he was arrested until he pleaded guilty in this court room." The conditions, happenings and transactions of which Dwyer testifies here occurred, if at all, some score of years ago. He contends that, in spite of contradictory statements made by him and of compromising acts done by him, years ago, his present representations are not afterthoughts or recent contrivances but that from the time of the homicide and for some weeks thereafter until his plea of guilty he was continuously victimized by Carroll and reacted resourcelessly to that enthrallment yet protested his innocence at given opportunities. Evidence is to be found in the record of this case to the effect that initially upon his apprehension in New Jersey Dwyer told the police he was not guilty and later voiced his apprehension at flying back to Maine in a 'plane with Carroll. Dwyer was 18 years old at that time. The testimony of Dwyer and of the witnesses, Aldrich, Verrill and Burns, upon the record tells of Dwyer's protestations of innocence and of fear before and immediately after the guilty plea. The Abbott testimony in part would seem to qualify as an exception to the general rule to the end of demonstrating, if it does,

that before his final plea Dwyer, consistently with his present position, asserted his innocence and plight to his trial counsel. We are confined and restricted to a consideration of the admissibility of the evidence. We conclude that it is admissible.

We express no opinion and have striven to give occasion for no intentional implication as to the weight or credibility or trustworthiness of the evidence which was excluded or of any of the evidence. Such appraisals and evaluation are for the trier of facts.

*Exceptions sustained.*