STATE of Maine

v.

Ronald W. BOOBAR, Jr.

Supreme Judicial Court of Maine.

Argued Jan. 6, 1994.
Decided March 1, 1994.

Michael E. Carpenter, Atty. Gen., Charles K. Leadbetter (orally), Asst. Atty. Gen., Augusta, for the State.

Martha Harris (orally), Paine, Lynch & Harris, Bangor, for defendant.

Before WATHEN, C.J., and GLASSMAN, CLIFFORD, COLLINS, RUDMAN and DANA, JJ.

CLIFFORD, Justice.

Ronald W. Boobar, Jr. appeals from a judgment entered in the Superior Court (Somerset County, *Smith, J.*) on a jury verdict finding him guilty of murder, 17–A M.R.S.A. § 201(1)(A) (1983). Boobar challenges the admissibility of his statement to police, of evidence relating to a demonstration videotaped at the crime scene, of evidence concerning a comparison of footprints found on the victim's body and on Boobar's car with prints made by Boobar's sneakers, of testimony relating to conversations Boobar had with fellow members of Alcoholics Anonymous, of evidence that the victim had sexual intercourse near the time of her death, and of evidence of a prior consistent statement. Boobar also argues that the trial court erred in excluding evidence he proffered seeking to implicate an alternative perpetrator, and he challenges the sufficiency of the evidence generally. Finding no reversible error, and concluding that the evidence is sufficient to sustain the conviction, we affirm.

At the trial, the jury heard evidence that on November 9, 1988, two passersby discovered the body of 14–year–old Rebecca Pelkey of Bangor in the woods along a tote road in Hermon. A state medical examiner determined that Rebecca had died of strangulation from a nylon rope that had been wound around her neck six times. The medical examiner estimated that Rebecca had been dead for between five and ten days at the time her body was discovered. Her mother testified that she had not seen Rebecca for nine days when notified of her daughter's death.

Thomas Dembowsky, a friend and coworker of Boobar, testified that on an evening in early November 1988, he and Boobar left a Bangor bar in Boobar's car while in the company of three teenaged girls, one of whom Boobar referred to as "Becky." According to Dembowsky, Boobar had volun-

teered to let Becky drive his car, and Boobar had asked her whether she had a boyfriend. The two friends of Rebecca's who were riding with her that evening also testified, indicating that the evening involved a joyride around various locations in Bangor, the drinking of vodka and orange juice, followed by Boobar dropping off everyone except Rebecca. One of the friends also testified that on the weekend following this incident, she let herself in the home that Rebecca shared with her mother, and received a telephone call from someone she thought was Rebecca, asking for a ride home for her and her mother.

When the State Police identified Boobar as the man who had last been seen with Rebecca, detectives immediately went to his home in Bangor, at approximately midnight of the day following the discovery of Rebecca's body. Boobar agreed to the detectives' request for an interview at the nearby Bangor Police Station; the taped interrogation lasted approximately four hours. Boobar repeatedly denied that he had killed Rebecca, maintaining that he had dropped her off at her home on the night in question.

The grand jury returned an indictment charging Boobar with murder, and he was arrested and held without bail at the Penobscot County Jail. A fellow inmate, Charles Kimball, Jr., testified that he overheard Boobar at the jail telling someone on the telephone that "I didn't mean to do it. I just kind of, like, blacked out. I was drunk and stuff." A second inmate, Richard Everett, Jr., told the jury that Boobar admitted to him and another inmate that he had killed Rebecca. While at the jail, Boobar also met with Daniel DesIsles, who conducted meetings of Alcoholics Anonymous (AA) at the lockup. DesIsles testified that Boobar confessed his guilt to him during a conversation.

Following a hearing, the court (*Beaulieu, J.*) denied Boobar's motion to suppress his statement to the police. After a subsequent hearing, the court (*Smith, J.*) transferred venue to Somerset County, but denied Boobar's motion *in limine* to exclude testimony regarding the statements Boobar made to DesIsles and another AA member with whom Boobar had attended an AA meeting prior to his arrest. Boobar filed this appeal after being convicted following a jury trial.

## I. The Police Interrogation

■ Boobar concedes that he was advised of his rights as required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and does not argue that those rights were not knowingly waived. In order to be admissible, however, a statement must be voluntary beyond a reasonable doubt. *State v. Curtis*, 552 A.2d 530, 532 (Me.1988); *State v. Larrivee*, 479 A.2d 347, 349 (Me.1984); Me. Const. art. I, § 6. "A statement is voluntary if 'it results from the free choice of a rational mind, if it is not the product of coercive police conduct, and if under all of the circumstances, its admission would be fundamentally fair.'" *Curtis*, 552 A.2d at 532 (quoting *State v. Mikulewicz*, 462 A.2d 497, 501 (Me.1983)). In order to be voluntary, a statement must be the result of a defendant's exercise of his or her own free will and rational intellect. *State v. Caouette*, 446 A.2d 1120, 1123 (Me.1982).

■ We review a trial court's determination on voluntariness for clear error, and we will not overturn a finding of voluntariness beyond a reasonable doubt if the evidence rationally supports that determination. *Larrivee*, 479 A.2d at 349. The State bears the burden of establishing voluntariness beyond a reasonable doubt, but the trial court should look to the totality of the circumstances in making its determination as to the admissibility of an accused's statement to police. *State v. Smith*, 615 A.2d 1162, 1163 (Me.1992).

■ Boobar maintains that his exhaustion and emotional state during the interrogation (the statement was obtained late at night, at a police station, over a four-hour period), his ignorance of the fact that he was the prime suspect (the police did not inform him that he was a suspect in a homicide, telling him that the case involved a missing person), and the tactics used by the detectives (they used "good cop-bad cop" interviewing techniques and were not fully candid about the nature of their investigation at first, indicating only that they were seeking information about a

**1166**

missing person, disclosing later that they were investigating Pelkey's murder and that Boobar was a suspect) required the trial court to conclude that in the totality of the circumstances his statement was not voluntary. We disagree. There were three breaks during the interview, and opportunities for Boobar to drink coffee and make bathroom visits. The detectives advised Boobar that he could stop if he were too tired to continue the interview; Boobar assured them he was not too fatigued. Notwithstanding Boobar's fatigue, he was calm and lucid, *State v. Carisio,* 552 A.2d 23, 25 (Me. 1988), and any confrontational aspects of the interrogation did not render his statement involuntary. *State v. Candage,* 549 A.2d 355, 359–60 (Me.1988); *see also State v. Scheuler,* 488 A.2d 481, 484 (Me.1985). Moreover, in the absence of evidence suggesting that the police were abusive or hostile, the fact that the interrogation lasted several hours does not mean that the statements were involuntary. *See State v. Gosselin,* 594 A.2d 1102, 1105 (Me.1991). On this record, the trial court's finding that Boobar's statement was voluntary beyond a reasonable doubt was not clearly erroneous. *See State v. Barczak,* 562 A.2d 140, 145 (Me.1989).

## II. The Demonstrative Evidence

During their investigation, and with Boobar's permission, the State Police took custody of Boobar's car. They pinpointed a dent on the vehicle's left-side mirror and hypothesized that this dent might correspond to a fresh-appearing gouge they had discovered in a tree beside the tote road near the crime scene. The investigators also found particles of black paint in the tree, noting that the mirror had a dent in the bottom left-hand corner from which some black paint had apparently been scraped off. The tree in question was a balsam fir; particles of vegetative matter found on the mirror proved to be not inconsistent with balsam fir. The investiga-

tors cut down the tree and took it to the State Police crime lab for analysis. The detectives then took the car to the scene, moved the vehicle into the position indicated by tire tracks they had identified there, replaced a four-foot section of the tree with the gouge in it on the stump from which it had been cut, and drove the car past the tree stump while videotaping the proceedings. At the trial, over Boobar's objection, the State introduced evidence of this demonstration, including the videotape, to suggest to the jury that it had been Boobar's car that had caused the gouge in the tree.

Boobar argues that the admission of this evidence was error, maintaining that pursuant to M.R.Evid. 403, the danger of creating unfair prejudice to the defendant outweighed any probative value, and that the testimony concerning the demonstration was inadmissible pursuant to the standard for expert testimony articulated in M.R.Evid. 702.[1] We review a trial court's evidentiary rulings for clear error or an abuse of discretion. *State v. Schuman,* 622 A.2d 716, 718 (Me.1993).

The results of an evidentiary experiment such as the one at issue here are admissible if the experiment is conducted under circumstances that bear a substantial similarity to those surrounding the event at issue. *State v. Hardy,* 489 A.2d 508, 511 (Me.1985). Even experiments that are not entirely similar to the event in question may be "enlightening" to the jury; variations between the experimental and actual conditions go to the weight rather than the admissibility of the evidence. *Id.* In *Hardy,* the refusal by the trial court to admit a demonstration involving a candle, offered by the defendant to suggest that he could not have committed an arson as charged, was an abuse of discretion. *Id.; but see State v. Philbrick,* 436 A.2d 844, 859–60 (Me.1981) (trial court erred by admitting in-court demonstration involv-

---

1. M.R.Evid. 403 provides that:
   Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
   M.R.Evid. 702 provides that:

   If scientific, technical, or other specialized knowledge will assist the trial of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

ing front seat and dashboard of car, along with mannequins representing victim and defendant, to show bullet trajectories; detective who conducted experiment lacked requisite expertise in such analyses, mannequins were too dissimilar to the actual persons involved, and exact measurements between seats and dashboard could not be pinpointed).

■ The videotaped demonstration involving Boobar's car at the crime scene is far more similar to the candle experiment sought to be admitted in *Hardy* than the bullet experiment that was erroneously admitted in *Philbrick.* The experiment was substantially similar to what would have been the actual occurrences at the time of Rebecca Pelkey's death according to the version of events asserted by the State. Dr. Charles W. Smith, a physics professor who testified on Boobar's behalf, suggested that there were certain flaws in the demonstration, i.e., that the removed section of the tree could not be returned to its original location with complete accuracy, and that the vehicle that actually caused the gouge would have been traveling at a greater speed than in the reenactment, thus varying the gouge that the vehicle would have made in the tree. These questions, however, go to the weight rather than the admissibility of this evidence. *Hardy,* 489 A.2d at 511.

■ Detective Ronald Richards of the State Police testified that this demonstration proved that Boobar's car could have caused the gouge in the tree. We have no reason to conclude that the trial court erred or abused its discretion by admitting this conclusion as expert testimony, supported by a properly laid foundation as to Richards' qualifications pursuant to Rule 702. Richards testified that he had spent ten years as a fingerprint examiner and crime-scene investigator for the State Police crime laboratory. This testimony of specialized knowledge was a sufficient basis from which the trial court could conclude that Richards had sufficient exper-

tise to state the limited conclusion that Boobar's car could have been the source of the gouge in the tree. *See State v. Herbest,* 551 A.2d 442, 445–46 (Me.1988); *State v. Atkinson,* 458 A.2d 1200, 1204 (Me.1983); *Philbrick,* 436 A.2d at 860–61; Field & Murray, *Maine Evidence* § 702.1 at 7–12 (1992).

■ The same principles apply to the footprint evidence, which Boobar also challenges as inadmissible pursuant to Rules 403 and 702. Investigators found seven identifiable footprints on the exterior of Boobar's car, and identified marks that resembled footprints on the victim's neck. They took impressions of the car footprints and photographs of the footprint on the body. Detective Craig Handley of the State Police crime lab laid a sheet of acetate over the photograph of the neck and copied the footprint onto the acetate with a black marker. He then took another acetate sheet and made ink impressions of the soles of the sneakers found in Boobar's car. He compared the two acetate sheets, as well as acetate sheets made from the exterior car footprints, and, over the objection of Boobar, testified at trial as to the results of this comparison. The photographs and acetate overlays were introduced in evidence. Handley concluded that the sneakers could have made the footprints on the car, and that the left sneaker shared "class characteristics" with the footprint on the victim's neck. Handley specifically stated that he could not conclude that the sneaker was definitely the one that had caused the footprint on the body.

■ Handley testified at length as to his extensive training in footprint analysis. His investigation and comparisons of the footprints were based in sound police techniques rather than scientific speculation or conjecture. The lack of absolute conclusiveness in his findings goes to the weight rather than the admissibility of the evidence. Accordingly, the trial court did not err, nor did it abuse its discretion in permitting the State to present this evidence to the jury.[2]

2. Boobar also challenges as irrelevant and excludable pursuant to M.R.Evid. 403, the admission of microscopic slides of wood and leaf fragments made by the State's expert for the purpose of identifying the species of vegetation found on

Boobar's car, as well as admission of the damaged mirror and tree segment. We review a trial court's determination of relevancy for clear error, *State v. Robinson,* 628 A.2d 664, 666 (Me. 1993), and find none here. Nor do we conclude

### III.  The Evidence of Sexual Activity

██ Forensic examination of the victim's body revealed the presence of semen in the vagina and on the external genitalia.  The concentration of sperm was found to be much greater in the vaginal sample than in the external sample.  Dr. Ronald Roy, the medical examiner who gathered this evidence with the help of a forensic chemist, testified over the objection of Boobar that these facts suggest that Rebecca Pelkey had sexual intercourse close to the time of her death.[3]  Chemical testing neither confirmed nor ruled out that Boobar was the source of the semen.  Investigators found six pubic hairs at the scene, however, and the jury learned that the forensic chemist had determined that two of them were identical in appearance to Boobar's pubic hair.[4]  Moreover, during the autopsy, the medical examiner found a pubic hair on the victim's shirt that was also found to be identical in appearance to those of Boobar.  The defendant challenges the admission of all evidence relating to sexual contact, arguing that it is irrelevant and excludable pursuant to Rule 403 because the jury was likely to be inflamed by evidence suggesting that a 14-year-old girl had been engaging in sexual relations.

We review the trial court's determination of relevancy for clear error.  State v. Robinson, 628 A.2d 664, 666 (Me.1993).  The similarity of the pubic hairs to those of the defendant makes the sexual contact evidence probative.  Moreover, the State's theory was that Boobar's interest in pursuing an intimate relationship with the victim, as suggested by the testimony of the girls who had been riding with Rebecca and Boobar, is consistent with the evidence suggesting that sexual intercourse occurred near the time of the victim's death.  The inconclusiveness as to the source of the semen does not render that evidence excludable as irrelevant.  Even though the sexual intercourse itself is not an element of the charged crime, the definition of relevancy "also includes facts having only an indirect bearing on the issues in the case."  Maine Evidence § 401.1 at 4-2.  The court's determination that the evidence was relevant is not clearly erroneous.

██ Nor did the trial court abuse its discretion in not excluding the evidence because of its potential to inflame the jury.  As the trial court properly noted, the test in a Rule 403 determination is not whether the proffered evidence will prejudice the opponent's case, but whether the evidence will cause *unfair* prejudice for one of the reasons stated in the Rule.  State v. Hurd, 360 A.2d 525, 527 n. 5 (Me.1976).  Moreover, the danger of unfair prejudice must *substantially* outweigh the probative value of the evidence.  State v. Trafton, 425 A.2d 1320, 1324 (Me. 1981).  Rebecca Pelkey's death, and the circumstances surrounding this tragedy, were shocking and outrageous;  but that does not render evidence of those circumstances inadmissible on Rule 403 grounds.

### IV.  The Alcoholics Anonymous Testimony

One of the State's witnesses, Joseph Sapiel, testified that he is a member of Alcoholics Anonymous (AA), and that nine days after the discovery of Rebecca's body, Boobar called him for a ride to an AA meeting in Millinocket.  Sapiel testified that Boobar told him that he was a suspect in a murder case, that he had been with the victim and two of her friends, and that he had "gone parking" with the victim after dropping off her two companions.  According to Sapiel, Boobar stated that he was spending time with the

---

that the trial court abused its discretion in determining that any of this evidence was excludable pursuant to Rule 403.

3.  At the time the victim's body was discovered, partially propped up by a tree, it was unclothed from the waist down.  The victim's pants had been folded and placed in the victim's lap.  Her underwear was found some seventeen feet away, across the tote road.  Both garments were tested for semen and blood;  neither was detected.  From these facts, and the fact that the concentra-

tion of sperm was greater in the deep vaginal sample than on the external sample, Dr. Roy concluded that the victim had not been moving around a great deal following the intercourse because there was no evidence that the seminal fluid had drained significantly as it would have if the victim had been very active.

4.  Judith Brinkman, the forensic chemist who made these conclusions, was unable to testify at trial.  The jury saw a videotape of her deposition.

victim in order to help her with her drug problem and with the fact that she was pregnant.[5] Another prosecution witness, Daniel DesIsles, testified that, like Sapiel, he was acquainted with Boobar through their membership in AA. According to DesIsles, he was serving as a volunteer leader of AA meetings at the Penobscot County Jail at the time of Boobar's arrest, and that Boobar had called him from the jail on the day after his arrest. At Boobar's request, DesIsles met with the defendant at the lockup. DesIsles testified that during this meeting, Boobar twice made statements that DesIsles interpreted as admissions to killing. Rebecca.[6]

■ Boobar objected in a timely manner to the admission of the Sapiel and DesIsles testimony as privileged pursuant to federal and state law and the Maine Rules of Evidence, and excludable as unfairly prejudicial pursuant to Rule 403. He renews these objections on appeal. It is Boobar's contention that because his conversation with DesIsles took place in the jail while DesIsles was acting in his capacity as an AA leader, disclosure of his statements to DesIsles is illegal pursuant to the federal law guaranteeing confidentiality of federally-funded substance abuse treatment programs, 42 U.S.C.A. § 290dd–3 (1991), recodified as 42 U.S.C.A. § 290dd–2 (Supp.1993). However, as the jail administrator testified at the hearing on Boobar's motion *in limine* to exclude this evidence, the Penobscot County Jail was not the recipient of any federal funds for substance abuse treatment programs at the time of Boobar's incarceration there. Moreover, the federal statute he cites does not operate as a

rule of evidentiary privilege or exclusion; rather it provides for a civil fine in the event of a violation.

■ The Maine statutes cited by Boobar are similarly unavailing. 32 M.R.S.A. § 13862 (Supp.1993) sets forth an evidentiary privilege for certain information disclosed to licensed counselors and therapists. Boobar concedes that Sapiel and DesIsles were not licensed counselors, but suggests that this is a "distinction without a difference" because the legislature declared that the counsel and therapist licensure statute shall not be construed to prevent peer groups or self-help groups from performing counseling. *See* 32 M.R.S.A. § 13856(6) (Supp.1993). It is not reasonable to conclude, however, that by the language of section 13856(6), the legislature intended to sweep information disclosed to peer counselor or self-help groups like AA within the privilege set forth in section 13862. Similarly, and contrary to the assertion of Boobar, the statute governing confidentiality of inmate records, 34–A M.R.S.A. § 3003 (1988 & Supp.1993), and the statute setting forth a limited privilege for disclosures to licensed social workers, 32 M.R.S.A. § 7005 (1988), plainly do not apply to these circumstances.

■ Finally, contrary to Boobar's contentions, the trial court correctly concluded that M.R.Evid. 503, governing disclosures by patients to psychotherapists, and M.R.Evid. 505, governing disclosures to clergy acting as spiritual advisers, do not apply, and correctly admitted the DesIsles testimony.[7] Boobar

---

5. At trial, the parties stipulated to the fact that Rebecca was not pregnant at the time of her death.

6. Specifically, DesIsles testified that

[Boobar] started telling me, in the beginning, of how he went out with three—I think it was three girls and a guy and they were out partying and—and, then, he dropped off all but one girl and, then, they went out parking and, then, they got into an argument and he can't remember what happened after that.

According to DesIsles, his reaction was to seek to discourage Boobar from discussing these events further, because they did not relate to the AA program. But, according to DesIsles, Boobar persisted:

Well, he was giving me—telling me different stuff in between, you know, and I was trying to say about the Twelve Step program. And, at the end, he looked at me and he said, "You and one other person know that I did it." And, then, at the end when I was walking out, he said, "I did it."

DesIsles told the jury that Boobar did not specifically indicate what "it" was.

7. M.R.Evid. 503 vests in a patient the privilege to prevent disclosure at trial of confidential communications to a physician or psychotherapist. The Rule defines "psychotherapist" as

(A) a person authorized to practice medicine in any state or nation, or reasonably believed by the patient so to be, while engaged in the diagnosis or treatment of a mental or emotion-

concedes that DesIsles is not a psychotherapist or a member of the clergy, but argues that he may assert the Rule 503 and 505 privileges in light of the language in each rule protecting disclosures or persons he "reasonably believed" to be a psychotherapist or member of the clergy.

As to Rule 503, we note that the "reasonable belief" language, by its terms, applies only to persons authorized to practice medicine and not to psychologists. Boobar does not contend that he reasonably believed DesIsles to be a medical doctor. As to the religious privilege, there is nothing in the record to suggest that as an Alcoholics Anonymous counselor, DesIsles was representing himself as a member of the clergy. The purpose of the "reasonable belief" statute in both rules is to protect disclosures made to impostors or persons otherwise misrepresenting themselves as medical professionals or members of the clergy. *See Maine Evidence* § 503.2 at 5–24 (noting the parallel between this language and the language in M.R.Evid. 502, governing lawyer-client privilege, and the unfairness of imposing on a patient the responsibility for knowing that he or she is being treated by an impostor). Although DesIsles, in his AA work at the jail, performed some of the same functions that a psychotherapist or member of the clergy might engage in, this does not serve to create a reasonable belief that he was actually functioning as a psychotherapist or member of the clergy. Accordingly, the trial court did not err in admitting the Sapiel or DesIsles testimony. Moreover, Boobar has advanced no credible argument as to why the court abused its discretion in not excluding this testimony as unfairly prejudicial pursuant to Rule 403.

## V. The Prior Consistent Statement

Boobar next argues that the trial court erred in admitting the testimony of Lisa Marie Cyr. The sole purpose of Cyr's testimony was to corroborate the testimony of her boyfriend, Richard Everett, Jr., who stated that he had been incarcerated at the Penobscot County Jail for a brief period during the time that Boobar was there awaiting trial. According to Everett, Boobar bragged of having committed the murder. On cross-examination, Everett testified that he waited for more than one year before coming forward with this disclosure. The State then called Cyr to testify that Everett had told her about Boobar's confession immediately on Everett's release from jail.

When the prior consistent statement is offered to rebut an express or implied charge of improper influence or motive pursuant to the exception to the hearsay rule set forth in M.R.Evid. 801(d)(1),[8] the proponent of the statement must demonstrate that the statement precedes the existence of the influence or motive. *State v. Phillipo*, 623 A.2d 1265, 1267 (Me.1993); *State v. Swain*, 493 A.2d 1056, 1059 (Me.1985); *State v. Fredette*, 462 A.2d 17, 22–23 (Me.1983); *State v. Graves*, 609 A.2d 717, 718 (Me.1992).

In this case, however, there was no charge, express or implied, of improper influence on Everett, nor was there any suggestion of any motive he may have had to falsify his testimony. Rather, the State introduced his prior consistent statement purely to rebut an implied charge of recent fabrication. Because the word "or" appears in Rule 801(d)(1) between "recent fabrication" and "improper influence or motive," the Rule establishes that rebuttal of a charge of recent fabrication is an independent ground for admission of a prior consistent statement.

---

al condition, including alcohol or drug addiction, or, (B) a person licensed or certified as a psychologist or psychological examiner under the law of any state or nation, while similarly engaged.
M.R.Evid. 505(b) sets forth that a person has a privilege to prevent disclosure of "a confidential communication by the person to a clergyman in his professional character as spiritual adviser." The Rule defines "clergyman" as "a minister, priest, rabbi, accredited Christian Science practitioner, or other similar functionary of a religious

organization, or an individual reasonably believed so to be by the person consulting him." M.R.Evid. 505(a)(1).

8. In relevant part, M.R.Evid. 801(d)(1) provides that "[a] prior consistent statement by the declarant whether or not under oath, is admissible only to rebut an express or implied charge against him of recent fabrication or improper influence or motive."

When there is an express or implied charge against the declarant of recent fabrication *or* improper motive or influence, it may be rebutted by showing a consistent statement made at an earlier date *or* before the improper influence or motive existed.

*Maine Evidence* § 801.4 at 8–13 (emphasis added). This is in accord with a well-established evidentiary principle that antedates the 1976 adoption of the Maine Rules of Evidence:

Impeachment on the ground of recent contrivance must be distinguished (as it is not always) from [impeachment by bias, interest, or corruption]. It is more nearly connected with the case of impeachment by self-contradiction. The charge of recent contrivance is usually made, not so much by affirmative evidence, as by negative evidence that the witness did *not* speak of the matter before, at a time when it would have been natural to speak; his silence is then urged as inconsistent with his utterances now, i.e., as a self-contradiction.

4 Wigmore, *Evidence* § 1129 at 270–71 (Chadbourn rev. 1972). Adoption of the Maine evidence rules did not effect a change in what was the established law concerning admissibility of prior consistent statements. M.R.Evid. 801 advisers' note (noting that the language as to prior consistent statements stated rather than modified existing law and was therefore "probably unnecessary" except to distinguish the Maine rule from the federal counterpart, which admits such statements as substantive evidence); *see also State v. Rolls*, 389 A.2d 824, 828 (Me.1978) (noting that Rule 801 stated existing law).

In *Dwyer v. State*, 154 Me. 179, 145 A.2d 100 (1958), we noted that evidence of a prior consistent statement is admissible

"where it is claimed that the testimony is a recent invention or fabrication, *or* was given under bias or undue influence, or that the facts described in the previous testimony have been concealed under conditions which warrant the belief that, if true, the witness would have stated them."

*Id.* at 196, 145 A.2d 100 (emphasis added) (quoting *Wilson v. Jeffrey*, 328 Mass. 192, 194, 102 N.E.2d 426 (1951)).

Subsequent cases do not establish that when there is an implied charge of recent fabrication, a prior consistent statement is only admissible if the proponent affirmatively establishes that the prior statement was made prior to any improper motive. In *State v. Galloway*, 247 A.2d 104 (Me.1968), we held that after the defense introduced evidence of inconsistent statements, it was proper to admit testimony as to how the complainant described her assailant ten minutes after an alleged assault. *Id.* at 105–06. Without reference to bias or motive, we held that it was "proper to show through other witnesses that she had remained constant in her description of the assailant and that her testimony given on the stand was *not of recent contrivance*." *Id.* at 106 (emphasis added). In *Rolls*, 389 A.2d at 828, the first such case decided following promulgation of Rule 801, we observed that the rationale for the rule is to permit the factfinder "to consider a statement made prior to the time any improper motive *may have* arisen, as bearing on the credibility of the testimony given in court." *Id.* (emphasis added). Notably, *Rolls* did not declare that it is necessary to establish improper motive. Other jurisdictions have also acknowledged the distinct category of prior inconsistent statements admitted to rebut an express or implied charge of recent fabrication when there is no suggestion in the record of improper motive. *See, e.g., State v. McKinney*, 107 Idaho 180, 687 P.2d 570, 574 (1984); *People v. Welch*, 8 Cal.3d 106, 104 Cal.Rptr. 217, 223–24, 501 P.2d 225, 231–32 (1972); *State v. Crank*, 13 Ariz.App. 587, 480 P.2d 8, 12 (1971).

Unlike the circumstances in cases such as *Fredette* where the record demonstrated that any motive to fabricate would also have existed at the time of the prior statement, the testimony of Cyr was properly admitted to rebut the implication that Everett's testimony was recently contrived. Therefore, we cannot say the admission of Cyr's testimony was error.

## VI. The Alternative Perpetrator Evidence

Boobar next contends that the trial court deprived him of a fair and impartial trial by

not permitting him to introduce testimony designed to suggest that another person had both the opportunity and a motive to kill Rebecca Pelkey. Through an offer of proof made outside the hearing of the jury, the defense indicated that the alternative suspect's testimony would demonstrate that he is a friend and former intimate companion of Rebecca's mother, and that in 1986, while he was living with the Pelkeys, he had been the subject of a Department of Human Services investigation involving Rebecca.[9] He would have further testified that on the date Rebecca was last seen, he had driven from his hunting camp in Howland to the Pelkey residence in Bangor, where he took a shower. This trip took him near the place where Rebecca's body was discovered. According to the State, the alternative suspect would have testified that following his shower, he left the Pelkey home by himself, leaving both Heather and Rebecca behind. Over Boobar's objection, the trial court ruled this evidence inadmissible.

■■■ A criminal defendant is entitled to present evidence in support of the contention that another is responsible for the crime with which the defendant is charged, provided the evidence is of sufficient probative value to raise a reasonable doubt as to the defendant's culpability. *Robinson*, 628 A.2d at 667; *State v. Dechaine*, 572 A.2d 130, 134 (Me.1990), *cert. denied* 498 U.S. 857, 111 S.Ct. 156, 112 L.Ed.2d 122 (1990) (connection between alternative perpetrator and crime must be reasonably established by admissible evidence). Moreover, the probative value of the alternative suspect evidence must be weighed against the danger of confusing or misleading the jury, or considerations of undue delay and waste of time. *See* M.R.Evid. 403. The court must take into account the extent to which the alternative perpetrator evidence is in dispute, the time required to present it, and the extent of rebuttal evidence that it would generate, i.e., the extent that it would result in a trial within a trial.

"The connection between the alternative perpetrator and the crime must be *reasonably established* by the admissible evidence the defendant is prepared to offer. Without such evidence, a defendant cannot be allowed to use his trial to conduct an investigation that he hopes will convert what amounts to speculation into a connection between the other person and the crime."

*Robinson*, 628 A.2d at 667 (quoting *Dechaine*, 572 A.2d at 134) (emphasis in original).

■■■ In this case, the evidence proffered by Boobar established only the alternative perpetrator's familiarity with the general vicinity in which the body was found, and that there had been a fleeting contact between the alternative perpetrator and the victim on the date of her disappearance. The alternative perpetrator's belief that he had been investigated by DHS for alleged improper sexual contact with Rebecca some two years before her death, does not, in itself, amount to a reasonably plausible motive for killing her. We cannot say that the court's exclusion of the evidence was clearly erroneous or constituted an abuse of discretion.

## VII. Sufficiency of the Evidence

■■■ Finally, it is Boobar's contention that the evidence adduced at trial was insufficient to establish his guilt beyond a reasonable doubt. When reviewing a challenge to the sufficiency of the evidence in a criminal proceeding, we examine the evidence in the light most favorable to the prosecution to determine whether a factfinder could find every element of the criminal charge beyond a reasonable doubt. *State v. Ho Tai*, 629 A.2d 594, 595 (Me.1993). Mere suspicion of a defendant's involvement in the commission of a crime does not yield evidence sufficient to support a conviction. *Id.* A case built entirely on circumstantial evidence, however, is not necessarily insufficient to sustain a conviction. *State v. Bowman*, 611 A.2d 560, 561

---

9. The alternative suspect apparently believed that the DHS investigation concerned allegations of sexual abuse. In fact, at issue was an incident in which the alternative suspect allegedly used ex-cessive force in disciplining Rebecca. The DHS substantiated the allegation but closed the investigation without taking any action.

(Me.1992); *see also Dechaine*, 572 A.2d at 132, n. 3.

In this case, the evidence tending to establish that Boobar caused the death of Rebecca Pelkey was circumstantial. There was, however, direct evidence to establish that Boobar was acquainted with the victim and had been seen with her on the date of her disappearance, thus establishing his opportunity. The testimony as to Boobar's sexual interest in the victim, combined with the physical evidence found on or near her body, constitute evidence from which the jury could rationally have concluded that Boobar had a sexual motive for committing the crime of which he stood accused. And, the evidence tending to link Boobar directly with the death of Rebecca, although circumstantial, was extensive and varied. The record reflects that Boobar made statements suggesting his guilt on three different occasions following his arrest. The physical evidence from the scene, including the footprint comparisons and the demonstrative evidence involving Boobar's car, rationally support the inference that Boobar's confessions were truthful. Although Boobar presented evidence to contradict that presented by the State, we cannot say that the jury could not rationally find every element of the crime beyond a reasonable doubt. *State v. Priest,* 617 A.2d 537, 539 (Me.1992).

The entry is:

Judgment affirmed.

All concurring.