**STATE of Maine**

v.

**Stephen CANDAGE.**

Supreme Judicial Court of Maine.

Argued May 11, 1988.
Decided Aug. 31, 1988.

James E. Tierney, Atty. Gen., Charles K. Leadbetter, Garry L. Greene (orally), Asst. Attys. Gen., Augusta, for plaintiff.

William N. Ferm (orally), Ferm & McSweeney, Ellsworth, David W. Kee, William J. Tymoczko, Fellows, Kee & Tymoczko, Bucksport, for defendant.

Before McKUSICK, C.J., and ROBERTS, WATHEN, SCOLNIK * and CLIFFORD, JJ.

* SCOLNIK, J., sat at oral argument and participated in the initial conference, but retired before this opinion was adopted.

CLIFFORD, Justice.

The defendant, Stephen Candage, appeals from his conviction in Superior Court, Hancock County, of murder, 17–A M.R.S.A. § 201(1)(A) (1983), following a jury trial. Finding no reversible error, we affirm the judgment.

Viewed in the light most favorable to the prosecution, the jury rationally could have found the following facts. In October of 1986, Stephen Candage was living with his father, Roger,[1] in a small house off Gilbert Farm Road in Bar Harbor. Roger allowed a friend, James Whitney, to park his trailer in front of his house. Whitney lived in this trailer and frequently socialized with Roger and Stephen.

A few days after receiving a social security payment of several hundred dollars in late October 1986, Whitney obtained a $100 bill, exchanging five $20 bills with a friend who was having difficulty getting the $100 bill accepted in a local grocery market. On or about this same day Whitney mentioned to Roger and Stephen that Whitney believed he had lost his wallet.

On November 3, 1986, Angela Lynk of Seal Harbor, who was Stephen's former girlfriend, talked with Stephen on the telephone and was told that something would be happening in the next few days, and that the police would be in contact with her. He further said that the police would know that Stephen had done "it," but they would not be able to prove anything. He refused to elaborate any further, since, he said, there was a danger that Lynk would be considered to be an accomplice if he told her too much.

On Tuesday, November 4, 1986, Roger and Whitney spent much of the day drinking beer and driving around in Whitney's pickup truck. Later in the day, they returned to Roger's house. Stephen, who was at the house, wanted to buy beer and asked Whitney to drive him to a nearby store. Whitney agreed. When they returned, the three men sat in Whitney's

1. The Candages are referred to as "Roger" and "Stephen" throughout the remainder of this opinion so that they can be readily distinguished from each other.

trailer and drank beer. In the early evening, Roger left Stephen and Whitney and went into his house to have supper and watch television. As Roger watched television during the evening, he noticed that Stephen entered and left the house several times. No other person was present. Roger went to bed sometime after 10:00 p.m.

Roger woke up at about 6:00 a.m. on November 5. Stephen was not in the house at this time. Roger noticed that his rifle and rifle clip that he kept in his overalls were both missing. Roger walked outside and saw that Whitney's pickup truck was not in its usual location in front of his house. Roger walked into Whitney's trailer and discovered Whitney's dead body. Whitney had been stabbed several times. Roger returned to his house to call an ambulance, but he found his phone had been disconnected, necessitating his going to a neighbor for assistance. An ambulance and several police officers subsequently arrived at Whitney's trailer. Whitney's wallet was missing, and it was not found during a search of the area.

After an initial investigation, a search was begun to locate Stephen and Whitney's missing pickup truck. Whitney's truck was found the same day along the roadside at the intersection of Route 1 and Washington Junction Road in Hancock, facing in the direction of Ellsworth. Roger's rifle and clip were found in the cab of the truck. The truck was sealed, impounded and brought to the Ellsworth Fire Station for processing.

In the meantime, Stephen had appeared at the Ellsworth Holiday Inn, where he registered as a guest under his own name at 5:21 a.m. on November 5. Later in the morning, at around 11:30 a.m., Stephen registered for the following day, and paid for his room with a $100 bill. Shortly thereafter, the desk clerk heard a radio bulletin describing Stephen as a suspect in Whitney's murder. The Holiday Inn manager alerted the police to Stephen's presence.

The police obtained from a District Court judge a search warrant for Stephen's motel room and his clothing, based on much of the information described above, set out in an affidavit of Matthew Stewart, detective with the Maine State Police. Four State Police officers executed the warrant by forcibly entering Stephen's room during the afternoon of November 5. Stephen was asked to accompany the officers to the Ellsworth Police Station for an interrogation. Stephen did go to the station and was interrogated. Throughout the interrogation, Stephen told inconsistent stories but insisted that he did not kill Whitney. Stephen was arrested for Whitney's murder approximately 10 minutes after the conclusion of the interrogation.

Subsequent to his indictment Stephen filed a variety of motions, including a motion to suppress evidence seized during the raid on Stephen's motel room and statements he made to the police during the interrogation at the Ellsworth Police Station. After a hearing in Superior Court the motion to suppress was denied. Stephen's trial was held in October 1987. Motions for a judgment of acquittal were made and denied at the conclusion of the State's case and after Stephen presented his evidence. After the jury returned its verdict of guilty, Stephen filed a motion for judgment of acquittal or a new trial. This motion was likewise denied. This appeal was thereafter filed in a timely fashion.

### I.

Stephen's first argument in his appeal is that the evidence gathered from the search of his motel room and the seizure of his clothes should have been excluded from evidence because, contrary to the finding of the motion justice, the affidavit in support of the warrant failed to establish a substantial basis for the finding of probable cause for that search.

The standard of review for a magistrate's finding of probable cause with respect to a search warrant is a deferential one, the inquiry being limited to whether there was a substantial basis for the finding of probable cause, with the affidavit supporting the search warrant being read " 'with all reasonable inferences that may be drawn to support the magistrate's deter-

mination.'" *State v. Gallant*, 531 A.2d 1282, 1284 (Me.1987) (quoting *State v. Knowlton*, 489 A.2d 529, 532 (Me.1985)).

■ The affidavit in this case, relating most of the essential facts set forth previously,[2] provides a substantial basis to support the District Court's finding of probable cause for the search.

## II.

■ Stephen's next argument is that the hearing justice committed reversible error at the suppression hearing by refusing to allow testimony concerning an alleged misrepresentation in Detective Stewart's affidavit. During the suppression hearing Stephen's counsel had read into the record the following testimony of Detective Stewart given at the previously held hearing on bail:

> Q. If you had had enough evidence at the time you went to room 206 [Stephen's room at the Holiday Inn] ... that probably there was probable cause to arrest Mr. Candage for murder and he had tried to leave then, then you would have placed him under arrest, wouldn't you?
>
> A. [Stewart] Had I reached the conclusion I had probable cause to believe he committed the crime of murder, I certainly would have.

Stephen contends that Stewart's testimony at the bail hearing contradicted his statement in the affidavit that probable cause existed to search Stephen's Holiday Inn room. Stewart made the following assertion at the conclusion of his supporting affidavit:

> WHEREFORE, I have probable cause to believe, and do believe, that there may be evidence found on or in the clothing of Stephen Candage, or in his personal belongings, or in his room at the Holiday Inn, consisting of blood, bloodstains, a knife or knives, and money, which may be evidence of the crime of homicide.

Stephen argues that if Stewart testified at the bail hearing that he (Stewart) felt

there was not probable cause to arrest Stephen at the Holiday Inn, this indicates that Stewart was less than candid in asserting there was probable cause to search the motel room in the affidavit. At the suppression hearing, Stephen's counsel wished to examine Stewart about the alleged inconsistency between his affidavit statement and his later testimony at the bail hearing. Specifically, Stephen's counsel sought to elicit confirmation from Stewart that he did not believe there was probable cause to arrest Stephen. This request was denied by the hearing justice, who reasoned that, even assuming Stewart would expressly testify at the suppression hearing that he felt there was no probable cause to arrest Stephen at the Holiday Inn, there was no need to have had probable cause to arrest Stephen in order for there to have been probable cause to support the search warrant.

In *State v. White*, 391 A.2d 291 (Me. 1978), we addressed the issue of when a criminal defendant is entitled to an evidentiary hearing to explore the veracity of information in a supporting affidavit for a search warrant. In *White*, we held that:

> '[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that [an evidentiary] hearing [on this issue] be held at the Defendant's request.'

391 A.2d at 293 (quoting *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676–77, 57 L.Ed.2d 667 (1978)).

Stephen basically contends that (1) he made the substantial preliminary showing of a false statement required by *White* and (2) the concluding paragraph of the affidavit, wherein Stewart asserts his belief that probable cause exists to conduct a search,

---

**2.** The affidavit did not set forth Stephen's use of the $100 bill to pay for his motel room, Stephen's conversation with Angela Lynk, the dis-    connection of the telephone line and Whitney's statement about losing his wallet.

was a necessary prerequisite for a finding of probable cause.

Neither of these arguments has merit. With respect to Stephen's burden to make a substantial preliminary showing of a false statement, we stated in *White* that such a showing should consist of " 'allegations of deliberate falsehood or of reckless disregard for the truth, and these allegations must be accompanied by an offer of proof.' " *White*, 391 A.2d at 293 (quoting *Franks*, 438 U.S. at 171, 98 S.Ct. at 2684). All Stephen has offered in this case is an ambiguous excerpt from the bail hearing transcript and Stephen's conclusory assertion that Stewart did not believe he had probable cause to arrest Stephen at the Holiday Inn. Even if Stephen's allegation that Stewart did not believe probable cause to arrest existed at the Holiday Inn is accepted as true as to this issue, this does not undermine the validity of the affidavit, that purported to establish probable cause for a *search*, not an arrest.[3]

■ Moreover, Stewart's subjective conclusion as to probable cause was not necessary to the issuance of the warrant. A finding of probable cause to support the issuance of a warrant for a search is a legal conclusion made independently by a judge or complaint justice based on his or her analysis of the facts and law in a particular case. Thus, Stewart's subjective belief was irrelevant for purposes of the District Court judge's legal determination of probable cause. *See Florida v. Royer*, 460 U.S. 491, 507, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983); *State v. Heald*, 314 A.2d 820, 828 (Me.1973); *accord State v. Parkinson*, 389 A.2d 1, 8 (Me.1978). The motion justice correctly refused to allow Stephen to pursue that avenue of inquiry.

### III.

Stephen next argues that his statements to the police during the interrogation at the Ellsworth Police Station should have been suppressed because they were not made voluntarily. The motion justice concluded that *Miranda* warnings were properly given and that Stephen's statements were voluntary beyond a reasonable doubt.

■ A statement, to be voluntary, must be the result of the defendant's exercise of his own free will and rational mind. *State v. Franklin*, 463 A.2d 749, 752 (Me.1983). At the suppression hearing, the State had the burden of proving the voluntariness of Stephen's statements beyond a reasonable doubt. *State v. Collins*, 297 A.2d 620, 627–30 (Me.1972). Our review of the motion justice's conclusion is a limited one: "A trial court's determination that the State has met its burden will not be disturbed on appeal if there is evidence in the record that rationally supports it." *State v. Larrivee*, 479 A.2d 347, 349 (Me.1984).

■ Stewart and Detective David Giroux, who both conducted the interrogation, testified at the suppression hearing. Stephen also testified. Stewart and Giroux testified that when the search of Stephen's motel room was conducted, Stephen was patted down for weapons and asked if he wished to accompany the officers to the police station for questioning. Stephen agreed and accompanied the officers to the station. Upon arriving at the station, Stephen was led into a police lieutenant's office, where the interrogation was conducted. *Miranda* warnings were read to Stephen at the beginning of the interrogation, and the record reflects that he understood those warnings and agreed to talk to his interrogators. Stephen was not physically restrained during the trip to the station or during the subsequent interrogation.

The transcript of the interrogation indicates that Stephen, in addition to denying any involvement in the murder, gave inconsistent explanations for his activities during the previous 24 hours. At no time during the interrogation did Stephen request that the proceedings be stopped. Although the transcript does reveal that Stewart conducted the interrogatories in a confrontational way, we cannot say that

---

**3.** As discussed in Part IV *infra,* we conclude that there was probable cause to arrest Stephen at the Holiday Inn.

the motion justice erred in finding Stephen's statement to be voluntary.

## IV.

Stephen further argues that he was arrested without probable cause at the Holiday Inn and consequently the fruits of the allegedly illegal arrest should have been suppressed, including his statement given during the interrogation.

█ In his written decision denying the motion to suppress, the suppression justice found that Stephen was placed in a "custodial situation" at the motel, but that there was probable cause for that "detention" and "no illegality in the seizure."

The State contends that the motion justice's references to "custodial situation," "detention" and "seizure" do not necessarily indicate a finding that Stephen was, in effect, placed under arrest during the search of the motel room. Rather, the State argues, Stephen was brought to the police station to carry out the purposes of the search warrant, namely the search of his person and the seizure of his personal clothing and belongings, and if there was a seizure, it was within the scope of the search warrant. See People v. Sunday, 109 Ill.App.3d 960, 65 Ill.Dec. 461, 466, 441 N.E.2d 374, 379 (1982). However, custodial and custody are terms usually associated with arrest for purposes of triggering Miranda warning requirements. See, e.g., Berkemer v. McCarty, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); United States v. Streifel, 781 F.2d 953 (1st Cir. 1986); State v. Bridges, 530 A.2d 718 (Me. 1987). In addition, Stephen testified that he was detained to a degree associated with formal arrest. See Streifel, 781 F.2d at 961; Bridges, 530 A.2d at 720. We conclude that the motion justice found Stephen to have been arrested at the motel, and that the arresting officers had the necessary probable cause to make the arrest.

█ Stephen contends that Detective Stewart's lack of subjective belief that sufficient probable cause existed to arrest Stephen demonstrates that probable cause to arrest did not exist. This argument is without merit. Probable cause to arrest exists whenever facts and circumstances within the knowledge of the police and of which there was reasonably trustworthy information would warrant a prudent and cautious person to believe that the arrestee had committed the crime. State v. Anderson, 447 A.2d 827, 829 (Me.1982). The information determining the existence of probable cause is not limited to what Detective Stewart knew of his own personal knowledge, but includes all the information known to the police. In addition to information set out in the affidavit, the officers knew that Stephen had overheard an earlier discussion between Roger and Whitney concerning the amount of money ($200–$250) in the wallet Whitney believed he had lost. The totality of this information was sufficient for the officers to have had probable cause to arrest Stephen. As discussed in Part II *supra*, a determination of probable cause in this kind of case is made objectively, without regard to one officer's subjective belief. Therefore, any suggestion that at the time of the bail hearing Stewart may not have believed there was probable cause to arrest Stephen at the Holiday Inn does not invalidate the otherwise valid detention of Stephen.[4]

## V.

Stephen's next argument is that the trial testimony of prosecution witnesses Nancy Oliver and Detective Stewart concerning a prior, out-of-court photographic identification of Stephen by Oliver was inadmissible hearsay, the admission of which constituted reversible error.

Oliver was working as a cashier at the Mobil Mart on High Street in Ellsworth. Between 4:00 and 5:00 a.m. on November 5, 1986, she recalled a man with uncombed hair and a beard coming into the store and buying a bag of chips and cigarettes.

---

4. Since we find that the police had probable cause to arrest Stephen at the time of the motel room search, we do not address Stephen's contention that M.R.Crim.P. 41(b)(4) allows seizure of a person only when there is probable cause to arrest.

Oliver recognized Stephen's picture in the *Bangor Daily News* the day after the murder and contacted Stewart. Stewart then showed Oliver a photographic array of six individuals including Stephen. Oliver identified Stephen's picture as being similar in appearance to the man who had come into the store during the early morning hours of November 5.

At trial, Oliver testified about those early morning events. She could not make an in-court identification of Stephen due to his changed appearance; he had shaved off the beard he had in November, 1986, and cut his hair. Nothing of what Oliver said was excludable testimony since she was describing a past incident.

■ Stewart testified about Oliver's identification of the photograph and identified the photograph as being that of Stephen.[5] Stephen objected to Stewart's testimony because it was a photograph and not a person that was being identified. The trial justice overruled Stephen's objection and determined Stewart's testimony to be admissible non-hearsay under M.R.Evid. 801(d)(1)(B). M.R.Evid. 801(d)(1)(B) reads, in pertinent part: "A statement is not hearsay if ... [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... one of identification of a person made after perceiving him." Although we have not previously addressed the question, federal courts have interpreted Fed.R.Evid. 801(d)(1)(C), identical to M.R.Evid. 801(d)(1)(B), to cover photographic as well as corporeal identifications. *See United States v. King,* 590 F.2d 253, 257 (8th Cir.1978), *cert. denied,* 440 U.S. 973, 99 S.Ct. 1538, 59 L.Ed.2d 790 (1979); *United States v. Lewis,* 565 F.2d 1248, 1250–53 (2d Cir.1977); *United States v. Hudson,* 564 F.2d 1377, 1379 (9th Cir.1977). We see no reason why M.R.Evid.

801(d)(1)(B) should be interpreted differently to exclude photographic identifications.

### VI.

■ Stephen's final argument is that there was insufficient evidence to convict him. In addition to the evidence already described, including Stephen's inconsistent and incredible statements concerning his actions,[6] there was evidence that Stephen knew where Roger's rifle and ammunition clip were stored in Roger's home, and testimony that Stephen admitted he killed Whitney to a fellow prisoner in the Hancock County Jail. Moreover, Roger testified that his dog, Toby, would bark whenever any strangers came in the house. Roger did not hear Toby barking during the night of the murder, indicating that whoever entered the house to take Roger's rifle and ammunition clip that evening was not a stranger. Although the blood type could not be ascertained, blood was found on Stephen's pants. The circumstantial evidence against Stephen, viewed in the light most favorable to the State, was sufficient for a jury to have rationally found him guilty beyond a reasonable doubt. *State v. Barry,* 495 A.2d 825, 826 (Me.1985).

The entry is:

JUDGMENT AFFIRMED.

All concurring.

5. Stephen also contends that his picture in the photographic array used by Stewart was improperly admitted in evidence, due to the "inflammatory" nature of the picture. Stephen, who wore a beard at the time his picture was taken, is pictured in the array with five other bearded men. Our examination of the array leads us to conclude that it was not inflammatory for the jury to have seen Stephen as he appeared in the array.

6. For example, Stephen said he discovered Whitney's dead body but did not report it, that he took Whitney's wallet, but later denied taking the wallet, saying he actually took a cigar or cigarette box.