STATE OF MAINE                                    SUPERIOR COURT
PENOBSCOT, ss                                     CRIMINAL ACTION
                                                  DOCKET NO. CR-02-169
                                                  EAH-PEN-8

STATE OF MAINE                    )

FILED AND ENTERED
SUPERIOR COURT

AUG 26 2002

PENOBSCOT COUNTY

V.                                )              DECISION ON MOTION
                                  )              TO SUPPRESS EVIDENCE
                                  )
                                  )
                                  )
JOSHUA SMOCK                      )

DONALD L. GARBRECH
DONALD LAW LIBRARY

LAW
AUG 26 2002

The Defendant in this matter has been indicted for Unlawful Furnishing of Scheduled

Drugs (17-A M.R.S.A. § 1106, Class C);Operating After Suspension (29-A M.R.S.A. §

2412, Class E) and Failure to Give Correct Name (29-A M.R.S.A. § 105, Class E).

Pending before the court is the Defendant's Motion to Suppress all evidence seized in

connection with his arrest on December 5, 2001. An evidentiary hearing was held on May

9,2002. The State's legal memorandum was filed on May 28, 2002. Due to extenuating

circumstances, the Defendant's memorandum was not filed until July 17, 2002. The

matter is now before the court for decision.

### BACKGROUND

Evidence produced at the hearing indicates that Det. Fred Luce of the Brewer Police

Department received information from a confidential informant on December 4, 2001 to

the effect that the Defendant Joshua Smock was engaged in drug trafficking. The officer

had previously worked with the informant and he had provided the officer with reliable

information. The officer did not know the Defendant.

The informant told the officer that the Defendant was selling the drugs out of his vehicle and that he kept the drugs in the vehicle and also on his person. The informant advised the officer that the Defendant was living in a large white apartment house on Main St. in Brewer and that he drove a unique, "weird colored" yellowish-tan GMC Jimmy vehicle which stood out in contrast to most other vehicles. The informant advised that there might also be a dark colored VW Jetta at the apartment house. The informant described the Defendant as a male, about 6' tall and as having unkempt, scraggly brown hair. The officer undertook to corroborate this information and testified that he was able to confirm the presence of the described vehicles at a large white apartment house on Main St. The GMC Jimmy was present at this home at the time of the officer's drive by check and the officer was able to obtain a license plate registration number for this vehicle. He ran a check on the registration number and determined that the GMC Jimmy was registered to a person by the name of Sherry Harrington. He also did a license check on Joshua Smock and learned that Mr. Smock's operating privileges were under suspension. He then checked some old police records and found that there was a "connection" between Sherry Harrington and Joshua Smock.[1]

On December 5, 2002, the officer was in uniform and was parked in his police cruiser watching traffic near the entrance to Indian Trail Park in Brewer. While he was parked he noticed a GMC Jimmy drive by. The officer was not able to identify any of the occupants in the vehicle, but he was able to observe the license plate and confirm that it was the same vehicle that he had observed the day before.

---

[1] The officer did not elaborate upon the nature of this connection.

The officer decided to follow the vehicle. He followed the vehicle as it proceeded down North Main St. until it pulled into the Texaco One Stop on North Main St. about 150 to 200 yards away. The vehicle pulled up to the gas pumps. The officer also pulled into the service station parking lot and he came to a stop about 50' away. The officer had not activated his blue lights or signaled to the operator of the GMC Jimmy in any way. The officer watched the vehicle and kept it continually in his field of vision. While the officer was watching the vehicle, he observed the driver exit the vehicle. There was no one else in the vehicle. At about the same time, the officer also exited his vehicle and began to walk towards the individual and the GMC Jimmy. As he walked towards the individual, the officer could tell that the individual standing beside the GMC Jimmy seemed to meet the description which the informant had given him for Joshua Smock. This person was also wearing a jacket with the name "Josh" on its front in plain sight. As the officer approached, the person turned away from him and it looked to him as though the person was putting something back in the vehicle. The officer could not see what it was.

The officer then came up to the individual and asked for his name and date of birth. The man replied that he was "Michael Harrington" and that his date of birth was 12/11/78. The officer asked the individual why the coat said "Josh" and the person replied that it belonged to his brother-in-law, "Josh Harrington." The officer then asked for some identification. The individual responded that he didn't have any. The officer then asked for and received the last four digits of his social security number.

The officer called his dispatcher and asked for a physical description for Michael Harrington. He also asked the dispatcher to check on the accuracy of the social security numbers for Michael Harrington. The dispatcher advised by radio that Michael Harrington was 5'7"" or 5'8" tall; had brown eyes and brown hair and weighed about 140 pounds. The officer could see that the person standing before him was about 5'11" and he estimated that he weighed 170 pounds. The dispatcher also advised the officer that the four social security digits, which the individual had provided him, did not match those for Michael Harrington.

The officer testified that at this point, he was quite certain that he was dealing with Joshua Smock. The officer then took the individual's wallet; searched it and discovered a Maine State hunting license issued to Joshua Smock. The individual then admitted that, indeed, he was Joshua Smock.

Det. Luce then arrested the Defendant for Operating After Suspension. He searched the Defendant following the arrest and he took the vehicle into police custody. Officer Munson assisted in an inventory search of the vehicle and during this search, found a dark green pill bottle on the floor of the passenger compartment of the vehicle along with two marijuana pipes.

The officer then transported the Defendant to the police station. Det. Luce asked the Defendant if he wanted to talk. The Defendant initially responded in the affirmative; then changed his mind, expressing concerns for his personal safety. Then Defendant shortly

changed his mind again and volunteered to talk to the officer. Det. Luce asked the Defendant if he was sure that he wanted to talk to him and the Defendant said yes. The officer then took the Defendant into the training room at the police station; took the handcuffs off him and read him the Miranda warnings. (See State's Exh. #1). The officer read each of the five listed rights to the Defendant who verbalized his understanding of those rights. The Defendant signed the waiver form indicating that he knew and understood all of his rights and that he had no questions. The Defendant was sober and coherent throughout this process and the officer described a non-threatening environment. The Defendant then made statements acknowledging his ownership of the contraband drugs and he advised the officer of his source for those drugs.

The Defendant now argues that the stop of his vehicle, the subsequent questioning of him by the officer and the search of the vehicle were all done in violation of his rights under the Fourth Amendment to the United States Constitution and article I, section 5 of the Maine Constitution and he seeks to suppress all evidence obtained subsequent to his initial contact with the officer.

## DISCUSSION

The court concludes that the officer did not stop the Defendant by simply pulling into the same gasoline station as the Defendant. The officer did not activate his blue lights nor did he signal to the Defendant in any way. The officer did not park his car so as to hinder the movement of the Defendant's vehicle. The officer simply got out of his cruiser and approached the Defendant. No one is protected by the Constitution against the mere approach of police officers in a public place. *State of North Carolina v. Brooks*, 337 N.C.

132, 446 S.E.2d 579. Police officers may approach individuals in public to ask them questions and even request consent to search their belongings, so long as a reasonable person would understand that he or she could refuse to cooperate. *Id* p. 142, quoting *Florida v.Bostick*, 501 U.S. 429, 431, 111 S.Ct. 2382, 2384, 115 L. Ed. 2d 389, 396 (1991). *See also, State v. Moulton* 1997 ME 228, ¶ 8, 704 A.2d 361, 363.Thus, when the officer approached the Defendant and simply asked him his name and for a follow up explanation of why the name "Josh" on his jacket was different from the name "Michael Harrington" given by the Defendant, the court concludes that, no investigatory stop had occurred and certainly no seizure. The Defendant told the officer the jacket belonged to his brother-in-law, "Joshua Harrington". The suggestion that brothers in law would have the same last name struck the officer as unusual and at this point, the officer believed that he was dealing with Joshua Smock.

The officer then proceeded to ask the Defendant for his date of birth and for last four digits of his social security number. He also requested that the Defendant produce some identification. At this point, the court concludes that there had been a sufficient show of authority to implicate constitutional protections against unreasonable searches and seizures. In asking for the Defendant's birth date, social security information and identification, the officer was conducting an investigatory detention of the Defendant. In order to justify an investigatory detention short of formal arrest, a law enforcement officer must act on the basis of specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. *See Moulton* 704

A.2d 361. The question becomes, whether the officer had a reasonable, articulable suspicion of wrongdoing at the time he asked for this additional information.

"When determining whether a law enforcement official had articulable suspicion, the key is what the officer observed, and whether it was reasonable in the totality of the circumstances known to him to conclude that a stop was justified. Reasonable suspicion is "considerably less than proof of wrongdoing by a preponderance of the evidence and is obviously less demanding than that for probable cause. The suspicion does need to be based on "more than speculation or an unsubstantiated hunch however. _State v. Eklund_ 2000 ME 175, ¶6, 760 A.2d 622, 624 (internal citations omitted).

By the time of the "detention/stop" in this case, the officer had learned from a reliable confidential informant that Joshua Smock drove a unique, weird colored, yellowish-tan GMC Jimmy. He had learned that Joshua Smock's right to operate a motor vehicle in this state was under suspension. He had seen the person he was now questioning exit from the driver's side of the same weird, yellowish-tan vehicle the officer had observed the previous day at the location provided by the informant. This person matched the physical description which he had received earlier for Joshua Smock, and he was wearing a jacket with the name "Josh" on the front of it. Although the person had identified himself as "Michael Harrington" and told the officer that the jacket belonged to "Josh Harrington", his brother-in-law, the officer, understandably, thought it unusual for brothers in law to have the same last name. The officer had also by this time had also contacted the police dispatcher to ask for a physical description of "Michael Harrington"

and to determine if the last four social security digits provided by the Defendant matched Michael Harrington's social security number. The Dispatcher provided a description for Michael Harrington as a person about 5'7" or 5'8" tall and weighing 140 pounds. The person present with the officer was about 5'11" tall and weighed 170 pounds. The social security number provided did not match Michael Harrington's social security number.

Under the totality of all of these circumstances, the court determines that it would clearly be objectively reasonable for the officer to suspect that the person standing before him was not Michael Harrington as he professed, but rather was Joshua Smock who had just committed the offense of driving after suspension. In the court's view, not only had the minimum "articulable suspicion" standard been satisfied but also circumstances had ripened to a level of probable cause to arrest.

Police officers may arrest a person whenever facts and circumstances within the knowledge of the police and of which there was reasonably trustworthy information would warrant a prudent and cautious person to believe that the arrestee had committed the crime. _State v. Candage_ 549 A.2d 355,360 (Me 1988). Probable cause is less than a fair preponderance of the evidence. _State v. Brann_ 736 A.2d. 251, (Me 1999). The quantum of proof necessary to establish probable cause is less than the level of a fair preponderance of the evidence; it is a flexible, common-sense standard that does not demand any showing that the officer's belief be correct or more likely true than false. _State v. Cilley_ 1998 ME 34,¶ 11, 707 A.2d 79, 83 (internal citations omitted).

Although in the court's opinion, the officer had probable cause to do so, the officer did not immediately arrest the Defendant. Rather, he conducted a further inquiry regarding whether the Defendant possessed a wallet. This led to the Defendant's production of a wallet, which the officer searched, discovering a hunting license issued to Joshua Smock. The Defendant promptly admitted that he was Joshua Smock. The officer arrested the Defendant for the offense of Driving After Suspension and took the Defendant and his vehicle into custody. Both the Defendant and the vehicle were searched and the drugs underlying the pending charges were discovered in the vehicle.

If officers have probable cause to arrest the occupant of a vehicle, they may search-incident to that arrest-not only the Defendant but also the entire interior of the vehicle and all containers found within the interior. _New York v. Belton_, 453 U.S. 454, 101 S.Ct. 2860, 69 L. Ed. 2d 768, _reh'g denied_, 453 U.S. 950, 102 S.Ct. 26, 69 L.Ed. 2d 1036 (1981). Further, a search may be made before an actual arrest, if the search and arrest are roughly contemporaneous.

_State v. Brooks_ 634 A.2d ,1267 (Me 1993). Thus, having probable cause to arrest the Defendant before his wallet and identity confirming hunting license came into the officer's possession, it is irrelevant that the wallet was examined prior to formal arrest of the Defendant.

Accordingly, the court finds that Det. Luce did not violate the Defendant's Constitutional rights and all physical evidence discovered during the officer's search, shall not be suppressed.[2]

The entry shall be: The Defendant's Motion to Suppress is denied in all respects.

Date: 8/20/2002

JUSTICE, SUPERIOR COURT

---

[2] In his motion, the Defendant also challenged use of his statements as evidence against him at trial. The evidence produced at hearing led the court to conclude that the Defendant was fully advised of his Miranda rights and made a knowing and voluntary waiver of those rights. The Defendant neither argued nor briefed this issue and accordingly the court deems the issue to have been waived.

DEFENSE COUNSEL:

    Laurie Miller, Esq.
    28 Main St Suite 1
    Bangor, ME  04401

COUNSEL FOR THE STATE:

    Gregory Campbell, Asst. D.A.
    97 Hammond Street
    Bangor ME  04401